## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**ex rel. ROBERT EVERSOLE** | **Civil Action No.:** _____ |
| **BRINGING THIS ACTION ON BEHALF**<br>**OF THE UNITED STATES OF AMERICA** | **Qui Tam Action** |
| **Plaintiff and Relator** | **FILED UNDER SEAL**<br>**Pursuant to 31 U.S.C. 3720(b)(2)** |
| **v.** | |
| **PINNACLE LABORATORIES, LLC**<br>    c/o Mitali U. Shah, Regis. Agent<br>    2375 Professional Heights Drive<br>    Suite 270<br>    Lexington, KY 40503 | |
| **MISSION DIAGNOSTICS, LLC**<br>    c/o Farid Maredia, Regis. Agent<br>    51 Rivercoach Lane<br>    Sugar Land, Texas | |
| **UDAY R. SHAH**<br>    14626 Bradford Colony Drive<br>    Houston, Texas | **DO NOT SERVE** |
| **LEENA U. SHAH**<br>    14626 Bradford Colony Drive<br>    Houston, Texas | **DO NOT PUT ON PACER** |
| **MITALI SHAH**<br>    14626 Bradford Colony Drive<br>    Houston, Texas | |
| **ABN BILLING COMPANY, LLC**<br>    c/o Angela Newman, Regis. Agent<br>    24460 HWY 383<br>    IOWA, LA 70647 | |
| **ANGELA NEWMAN**<br>    24460 HWY 383<br>    IOWA, LA 70647 | |

1

MLS Upper Management
     C/o Michelle L. Robichaux
     11200 Huffmeister Road #704
     Houston, Texas 77065


A&M Health Care Services, LLC
     c/o Farid Maredia, Regis. Agent
     10414 Rockley Road
     Houston, Texas 77099


              **Defendants**

## COMPLAINT

\* \* \* \* \* \* \*

## INTRODUCTION

1.     This is an action brought on behalf of the United States of America ("United States" or "Government"), by Robert Eversole (the "Relator") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").

2.     From May, 2014 through March 17, 2015 (the "relevant period") Pinnacle Laboratories provided, or claimed to provide, clinical diagnostic laboratory testing services out of its offices located in the Eastern District of Kentucky to Medicare and Kentucky, Ohio, West Virginia, Indiana, Louisiana and Texas Medicaid (collectively "Medicaid") beneficiaries. Pinnacle submitted claims for payment to Medicare, Medicaid and other federally-funded programs for its actual or alleged diagnostic laboratory services, and received reimbursement from Medicare, Medicaid and other federally-funded programs as a result of those claims.

3.     During the relevant period: (a) Pinnacle routinely billed Medicare, Medicaid and other federally-funded programs for laboratory Enzyme Immunoassay (EIA) screen tests that were not reasonable and necessary.  In particular, screen test results were not reported to the

2

beneficiary's physician and were not used in the management of the beneficiary's medical problems. Moreover, Pinnacle routinely performed and billed Medicare, Medicaid and other federally-funded programs for screen tests performed after confirmatory tests had been completed. (b) Pinnacle billed Medicare, Medicaid and other federally-funded programs for confirmatory tests that were performed by other laboratories; in fact, none of the confirmatory testing that Pinnacle billed were performed by Pinnacle.  (c) Pinnacle routinely billed Medicare, Medicaid and other federally-funded programs for confirmatory tests that were not reasonable and necessary.  In particular, Pinnacle billed for between 48 and 64 confirmatory tests on every sample it (or Mission Diagnostics) received from its clients.  In sum, hundreds of thousands of the confirmatory tests billed were not indicated by screen test results, were not ordered by the beneficiary's treating physician, and the tests results were not used for the diagnosis and treatment of the beneficiary's illness or injury.  The only variable that impacted the number of confirmatory tests performed was the referenced lab(s) used by Pinnacle.  (d) Remuneration was paid to physicians for referring these laboratory testing services to Defendants. (e) Free supplies, such as POCT cups, were given to physicians who referred patients to Defendants. (f) Without regard to hardship, deductibles and copayments due from Medicare, Medicaid and other federally-funded programs beneficiaries were routinely waived. (g) Charges that would otherwise have been due from self-pay patients were waived. (h) False and misleading documents were created and used that were material to Pinnacle's false claims.   (i) Pinnacle routinely made false certifications about its failure to comply with applicable Medicare laws, specifically Medicare's conditions of payment. The Defendants operated in concert to make false claims to Medicare, Medicaid and other federally-funded programs and to carry out these fraudulent schemes.

3

4.      The United States' claims against Defendants under the FCA are based upon false or fraudulent claims for payment that the Defendants knowingly presented, or caused to be presented, to Medicare, Medicaid and other federally-funded programs.   These claims were false or fraudulent in that they requested payment for diagnostic laboratory tests: (i) that were not medically reasonable or necessary; (ii) that were not performed by Pinnacle; (iii) based on false certifications; and, (iv) in violation of the Anti-Kickback Statute ("AKS").

## JURISDICTION AND VENUE

5.      This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq.

6.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

7.      31 U.S.C. §3732(a) permits nationwide service of process.

8.      This Court has personal jurisdiction over the Defendants.

9.      Pinnacle's laboratory and principal office is located in the Eastern District of Kentucky.

10.     Pinnacle transacts business in the Eastern District of Kentucky.

11.     Acts proscribed by 31 U.S.C. § 3729 occurred in the Eastern District of Kentucky.

12.     Pursuant to 31 U.S.C. 3731(a), venue is proper in the Eastern District of Kentucky.

13.     This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

14.     The allegations and transactions alleged in this Complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its

4

agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit or investigation; or from the news media.

15.     Relator is an "original source" of the information upon which this complaint is based, as that term is defined in the False Claims Act.

16.     Prior to filing this Action, Relator voluntarily disclosed to the United States the information on which the allegations and transactions in this Complaint are based.  Additionally, should there have been a public disclosure of any aspect of these allegations or transactions prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing this action.

## PARTIES

17.     The real party in interest is the United States of America.

18.     Relator, Robert Eversole, is a United States citizen and is currently a resident of Lexington, Kentucky.   From approximately June, 2014 through the filing of this Complaint, Mr. Eversole has served as the general manager and medical laboratory technician for Pinnacle Laboratories, LLC.  Mr. Eversole has an extensive background in laboratory testing in a variety of positions with the United States military and other healthcare providers and, at Pinnacle, has gained knowledge of the policies and practices of Defendants.

19.     Defendant, Pinnacle Laboratories, LLC ("Pinnacle Laboratories") is a manager-managed limited liability company, organized under the laws of Kentucky.   Pinnacle Laboratories operates in Fayette County, Kentucky and provides, or claims to provide, drug testing services to clients in Kentucky, Texas, Ohio, West Virginia, Indiana and Louisiana.

Pinnacle's manager is Defendant Mitali Shah. Pinnacle, is however, operated and controlled by Uday Shah.

20.     Defendant, Mission Diagnostics, LLC ("Mission Diagnostics") is a member managed, domestic limited liability company registered in Texas. Mission Diagnostics operates in Houston Texas. On information and belief, Mission's member managers are Leena Shah (Uday Shah's wife), Khairunissa Maredia and Diamond Patni. Mission is, however, operated and controlled by Uday Shah. Mission provides drug testing services to clients in Texas, Ohio, Nevada and New York as well as all of Pinnacle's clients.

21.     Defendant, A&M Health Care Services, LLC is a domestic limited liability company registered in Texas. A&M Health Care Services, LLC operates in Houston Texas. On information and belief, the managing members of A&M Health Care Services, LLC are Leena Shah (Uday Shah's wife), Khairunissa Maredia and Diamond Patni. A&M Health Care Services, LLC is, however, operated and controlled by Uday Shah.     A&M Health's CLIA number is 45D2054829.

22.     Mission Diagnostics routinely purports to also do business as A&M Health Care. Likewise, Mission Diagnostic utilizes A&M Health Care's CLIA number for its laboratory services.

23.     Defendant, Uday R. Shah is a resident of Houston, Texas. Uday Shah has represented to relator that he has a Ph.D. in Toxicology.

24.     Defendant, Mitali Shah is a resident of Houston, Texas. On information and belief, Mitali Shah is the daughter of Defendant, Uday R. Shah. Mitali Shaw is the manager of Pinnacle.

6

25.     Defendant, Leena Shah is a resident of Houston, Texas.   On information and belief, Leena Shah is the wife of Defendant, Uday R. Shah and mother of Defendant, Mitali Shah.   Leena Shaw is a managing member of Mission Diagnostics and A&M Healthcare Services, LLC.

26.     ABN Billing Company, LLC a Louisiana limited liability company with an address of 1200 N MLK Parkway, Suite 200, Lake Charles, LA.   ABN Billing Company is owned and operated by Angela Newman.   ABN Billing exclusively performs the billing function for Pinnacle and Mission Diagnostic (and likely other Shah Laboratories).

27.     On information and belief, Angie Newman is a resident of Iowa, Louisiana. Angie Newman is owner and sole officer of ABN Billing Compnay.

28.     Defendant, MLS Upper Management, Inc. is a domestic corporation registered in Texas.  Defendant Michelle Robichaux is the sole director of MLS Upper Management, Inc.

29.     On information and belief, Michelle L. Robichaux is a resident of Houston, Texas.  On information and belief, MLS Upper Management, Inc. is owned in whole or in part by Michelle L. Robichaux, Defendant Uday Shah's personal assistant.   Defendant Michelle Robichaux is the sole director of MLS Upper Management, Inc.

30.     Defendants John Does 1-10 are other health care providers and individuals who (1) participated in, and/or encouraged others to submit the fraudulent claims described herein and/or (2) accepted unlawful inducements from Uday Shah and/or corporate entities under his control, and participated in, and/or encouraged others to commit the fraudulent and wrongful acts set forth herein.

31.     Defendants ABC Corporations 1-10 are other health care providers, corporations and entities, that (1) participated in, and/or encouraged others to submit the fraudulent claims

described herein and/or (2) accepted unlawful inducements from Uday Shah and/or corporate entities under his control, and participated in, and/or encouraged others to commit the fraudulent and wrongful acts set forth herein.

## BACKGROUND

### A.   THE FALSE CLAIMS ACT

32.   The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009).

33.   The term "knowingly" under the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

34.   Violations of the FCA subject the defendant to civil penalties of not less than $5,500 and not more than $11,000 per false claim, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a).

### B.   THE MEDICARE AND MEDICAID PROGRAM

35.   In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. HHS, through CMS, administers the Medicare program.

36.   Part B of the Medicare program authorizes payment of federal funds for

medical and other health services, including clinical laboratory services. *See* 42 U.S.C. §§ 1395j, 1395k, 1395l, 1395x(s)(3); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).

37.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals who are age 65 or older, or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. 42 U.S.C. §§ 1395j, 13950, 1395r.

38.     Individuals or entities who are participating providers in Medicare, such as Defendants, may seek reimbursement from this program for services rendered to patients who are program beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies and procedures governing reimbursement.

39.     Medicare Part B does not pay for medical services, including clinical laboratory services, that are not reasonable and necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014). Medicare Part B also does not pay for routine examinations performed without relationship to treatment or diagnosis for a specific illness, symptom, complaint, or injury. Medicare Benefit Policy Manual, Chapter 16, § 90 (2014).

40.     Medicare Part B does not pay for diagnostic laboratory tests not ordered by the treating physician; as such tests are not reasonable and necessary.  42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014). *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).

41.     It is the responsibility of the clinical diagnostic laboratory to have sufficient processes and safeguards in place to ensure that all laboratory testing services are delivered ***only***

*when ordered by a physician or NPP*. 76 FR 38342, 38346 (2011). To ensure that only ordered tests are performed and billed to Medicare, clinical diagnostic laboratories may require the treating physician to sign a requisition identifying the ordered tests. 76 FR 38342, 38346 (2011). Medicare law permits a clinical diagnostic laboratory to develop its own compliance procedures to ensure that it only furnishes services in response to the treating physician's order. Such programs could include internal audits, agreements with ordering physicians to provide medical record evidence of the order, steps to confirm the existence of an order, or any other measures including the *acceptance of the risk by the clinical laboratory*. 76 FR 38342, 38346 (2011).

42.   To combat fraud and abuse in the Medicare and Medicaid programs, the Department of Health and Human Services, Office of Inspector General ("OIG") has developed and published Compliance Program Guidance for Clinical Laboratories. 63. F.R. 45076.

43.   Throughout the relevant period, Pinnacle had no compliance procedures to ensure that it performed and billed only tests ordered by treating physicians. On the contrary, Pinnacle did not require treating physicians to identify the laboratory tests he or she ordered for a beneficiary. Instead, Pinnacle referred each specimen to a reference laboratory with directions to perform a custom panel consisting of every confirmatory test the reference lab made available. Where the treating physician ordered specific tests, Pinnacle ignored the order and referred the specimen to a reference lab with directions to perform the maximum custom panel. Pinnacle routinely billed Medicare, Medicaid and other federally-funded programs for unordered diagnostic tests.

44.   Medicare Part B does not pay for diagnostic laboratory tests not used promptly by the treating physician for the management of the beneficiary's specific medical problem, as such tests are not reasonable and necessary. 42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A);

10

Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).  *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).

45.     Throughout the relevant period, Pinnacle performed screening tests, but did not communicate the test results to the treating physician.  The screening tests were not reasonable and necessary, as the test results were not promptly used for the management of the beneficiary's specific medical problem.  Pinnacle routinely billed Medicare, Medicaid and other federally-funded programs for these unreasonable and unnecessary screening tests.

46.     Likewise, throughout the relevant period, Pinnacle caused confirmatory tests to be performed that were unordered and unrelated to the beneficiary's specific medical problem.  The test results were of no material use in the management of the beneficiary's specific medical problem.  Pinnacle routinely billed Medicare,  Medicaid and other federally-funded programs for these unreasonable and unnecessary confirmatory tests.

47.     Medicare Part B payment for clinical diagnostic laboratory tests may be made only to the person or entity which performed or supervised the performance of the test; except that, in the case of a test performed at the request of a laboratory by another laboratory, payment may be made to the referring laboratory but <u>only if</u>:

     a.   the referring laboratory is located in a rural hospital;

     b.   the referring laboratory is wholly-owned by the entity preforming the test, the referring laboratory wholly owns the entity performing the test, or both the referring laboratory and the entity performing the test are wholly-owned by a third entity; or,

     c.   not more than 30 percent of the clinical diagnostic laboratory tests for which such referring laboratory receives requests for testing during the year in which the test is performed, are performed by another laboratory.

42 U.S.C. 1395l(h)(5)(A); Medicare Claims Processing Manual, Chapter 16 § 40.1.

48.     Pinnacle does not meet any of the exceptions to the direct billing requirement. Nonetheless, throughout the relevant period, Pinnacle routinely billed Medicare, Medicaid and other federally-funded programs for tests it did not perform; tests that it referred to other reference labs.

49.     Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKSU), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the, referral of any product for which payment is sought from any federally-funded health care, program, including Medicare, Medicaid, and TRICARE.  Violation of the statute can subject the perpetrator to criminal and civil penalties, as well as exclusion from participation in federally-funded healthcare programs.

50.     The AKS also provides that claims arising out of violations of its provisions are false claims. A claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42U.S.C §1320a-7b(g).

51.     Compliance with the AKS is a condition of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs, and claims submitted or caused to be submitted in violation of the AKS are false claims.

52.     When a provider submits a claim for payment, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the AKS.

53.     The AKS arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the

integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. NOI.100-93.

54.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions. The AKS makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal healthcare program. 42 U.S.C.1320a-7b.

55.     For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. Payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals, and remuneration is offered or paid in return for the promise to use a particular clinical laboratory qualifies as a kickback.  Offering free or discounted drug testing supplies in exchange for referrals constitutes an inducement under the AKS.  Paying all or portions of the salaries of specimen collectors and/or laboratory technicians stationed in a referring healthcare provider's office in exchange for referrals constitutes an inducement under the AKS.

56.     Throughout the relevant period, Defendants directly, or indirectly, paid remuneration to physicians for referring Medicare and Medicaid laboratory tests to Pinnacle.   In

fact, the treating physicians who referred Medicare and Medicaid testing to Pinnacle disclosed in writing to their patients that they (the treating physicians) were receiving remuneration for referring the testing to Pinnacle.

> I, the undersigned, understand that I am responsible for all co-pay and deductibles and for all amounts not covered by insurance. By signing this authorization I am acknowledging that payments(s) be made on my behalf to Pinnacle Laboratories for any services provided to me by Pinnacle Laboratories. I also allow the release of any medical information necessary to process this claim. **[Physician Name], MD has disclosed to me at the time of referral: (A) his, her affiliation with Pinnacle Laboratories and (B) that he, she or it will receive, directly or indirectly, remuneration for referring me**…

A representative example of the Requisition used by Pinnacle is attached as Exhibit 1.

57.     HHS, through CMS, also administers the Medicaid program, created in 1965 under Title XIX the Social Security Act, 42 U.S.C. § 1396, *et seq.,* to provide federally-funded health insurance to indigent persons whose incomes are insufficient to meet the costs of necessary health care.

58.     Funding for Medicaid is shared between the federal government and those states participating in the Medicaid program. Approximately 70% of each dollar spent by Medicaid is contributed by the federal government pursuant to Title XIX of the Social Security Act.

59.     Individuals or entities that are participating providers in Medicaid, such as Defendants, may seek reimbursement from this program for services rendered to patients who are program beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies and procedures governing reimbursement.

60.     Throughout the relevant period, Pinnacle was an enrolled provider in the Medicare and Medicaid programs. As enrolled providers, Pinnacle was permitted to submit

14

claims to Medicare and Medicaid for payment.

61.     Throughout the relevant period, Pinnacle submitted claims to Medicare through a Medicare Administrative Carrier ("MAC") which contracted with CMS to process and pay claims for Medicare Part B services.

62.     Throughout the relevant time period, Pinnacle submitted claims to State Medicaid agencies and contractors in Ohio, West Virginia, Kentucky, Indiana, Louisiana and Texas.

63.     Pinnacle submitted claims to Medicare, Medicaid and other federally-funded programs using a standardized claim form known as the CMS-1500 form. The treating physician must sign and date the form. By doing so, the physician certifies to the following statements that are printed on the back of each claim form:

        a.      For Medicare claims, "I certify that the services shown on this form were medically indicated and necessary for the health of the patient .... "

        b.      For Medicaid claims, "I certify that the services listed above were medically indicated and necessary to the health of the patient .... "

        c.      For Medicaid claims, "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

64.     As an alternative to use of the paper CMS-1500 claim forms, Pinnacle submitted claims to Medicare electronically after submitting an Electronic Data Interchange ("ED I") Enrollment Form to the MAC. By signing the EDI Enrollment Form, Pinnacle agreed that "it will submit claims that are accurate, complete, and truthful;" "that services were performed as billed;" and that "all claims will be paid from Federal funds, that the

15

submission of such claims is a claim for payment under the Medicare program .... "

65.     As an alternative to use of the paper CMS-1500 claim forms, Pinnacle submitted claims to Medicaid electronically after signing an addendum to its provider agreement called a MAP-380 form. Pinnacle acknowledged that its signature on the MAP-380 form "constitutes compliance with the following certification required of each individual claim transmitted by electronic media":

> This is to certify that the transmitted information is true, accurate, and complete .... I understand that payment and satisfaction of these claims will be from Federal and State funds and that any false claims, statements, or documents or concealment of a material fact, may b[e] prosecuted under applicable Federal and State Law.

66.     Defendants improperly submit reimbursement claims under Medicare and other federally-funded healthcare programs, in part, for billing for the provision of medically unnecessary urinalysis drug testing services.

67.     Defendants offer and provide healthcare facilities kickbacks to induce them to refer urine samples to Defendants for drug testing services.  As a result of the Defendants' illegal inducements, healthcare facilities referred Medicare and Medicaid patients to Defendants for drug testing services. By doing so, Defendants submitted false claims for payment and caused healthcare facilities to submit false claims for payment in violation of the Anti-Kickback Statute ("AKS").

**C.     CLINICAL LABORATORIES HAVE LONG BEEN AT THE FOREFRONT OF THE OIG'S FRAUD INVESTIGATIONS AND COMPLIANCE EFFORTS**

68.     Clinical laboratories were among the first health care entities to come under regulatory scrutiny by the U.S. Department of Health and Human Services Office of the Inspector General (OIG) as far back as 1992. The OIG had embarked on Project Lab Scam to investigate fraudulent billing practices by clinical laboratories. As a result, Laboratory Corporation of America

16

(Lab Corp) was fined and paid $187 million to resolve civil penalties under the False Claim Act for allegedly submitting claims for medically unnecessary tests.

69.     Also, in 1996, Damon Clinical Laboratories entered into a settlement agreement of $119 million with the Department of Justice in civil and criminal penalties for allegedly submitting false claims to the Medicare and Medicaid programs. Then in April 1998, Quest Diagnostics, Inc. entered into a settlement agreement with the U.S. Attorney's Office in Baltimore for approximately $6.9 million related to the billing of certain tests performed for which the Company had incomplete or missing order forms from the physician.

70.     The largest settlement of $325 million was paid by SmithKline Beecham Clinical Laboratories in 1997 for similar allegations of violations involving the Medicare, Medicaid, CHAMPUS, and Railroad Retirement Board health care programs.

71.     All told, the OIG reported more than $820 million in recoveries from clinical laboratories nationwide through Project Lab Scam. A watershed outcome of Project Lab Scam for the industry was the 1998 Compliance Program Guidance for Clinical Laboratories, one of the first such guidances issued by the OIG, which advised clinical labs to adopt fundamental compliance initiatives, such as a compliance committee, training and written policies and procedures. *See* OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 4,5076 (Aug. 24, 1998).

72.     The OIG has issued two Special Fraud Alerts directed at fraudulent schemes in the clinical laboratory industry. In 1994, the OIG published a collection of five previously issued fraud alerts, in pertinent part, concerning the Anti-Kickback Statute ("AKS"), arrangements for the provision of clinical laboratory services, the use of "shell" laboratories, and routine waivers of Medicare copayments.  In 2014, the OIG issued a Special Fraud Alert directed at laboratory payments to referring physicians.   Both Special Fraud alerts concern Pinnacle's fraudulent schemes.

### D.      URINE DRUG SCREENING AND CONFIRMATION TESTING

73.      Clinical laboratories such as Pinnacle test urine specimens and provide test results for physicians and other health care providers for the management of the patient's medical problems.  In certain cases, the physician is treating chronic pain patients and other patients who are prescribed opiates and other controlled pain medications. Because these drugs may be susceptible to abuse by the patient or third parties, physicians may deem it necessary to test their patients for drug usage and compliance.  In the Medicare and Medicaid context, the physician must order the specific tests that he or she determines are medically reasonable and necessary given the patient's specific medical problem, and then must use the test results for the management of the patient's specific medical problem.  In order to be useful in the management of the patient's medical problem—and therefore medically reasonable and necessary—the physician must promptly receive and use the test results.

74.      The traditional model for modern American health care is premised upon health care providers making decisions about treatment for those in their care based upon what they determine is best and medically necessary for their patients.  Health care providers, in order to treat their patients, have employed urine drug testing to answer two important questions:  1) is the drug that the health care providers prescribed actually in the patient's system; and 2) is there some other drug in the patient's system not prescribed by the health care providers which can lead to harmful drug interactions. Thus, under the traditional model, health care providers are and have always been incentivized to make decisions concerning urine drug testing based upon the needs of the individual patient placed in their care.  Some clinical labs, however, fraudulently and knowingly exploit the system to use patient care as a source of revenue rather than as a service for those in need.

18

75.     As described herein, Defendants fraudulently and knowingly exploit the system to use patient care as a source of revenue rather than as a service for those in need.

76.     Urine drug screening tests are designed to determine whether a urine sample contains drug levels at or above a certain cutoff concentration. In general, the drug screening methods are enzyme immunoassay ("EIA"), fluorescent immunoassay and point-of-care assay.

77.     Patient urine specimens are often initially screened at the health care providers' office through a urinalysis or drug screen, known as Point of Care Testing ("POCT").  POCT tests a urine sample and provides the physician with an immediate report on the presence or absence of certain drugs in the patient's system. POCTs are typically performed at the Health Care Provider's office or facility; using kits that contain a plastic cup with testing strips.[1]

78.     The EIA screen is more precise and more accurate than the POCT.[2]  Some health care providers have their own EIA screening analyzer in house.   Others send specimens to clinical laboratories such as Pinnacle for EIA screening.

79.     Based upon the results of the POCT, the ability to perform an EIA Screen in the physician's office, the patient's specific medical problem, the documented clinical needs of a patient, and the information the physician needs to manage the patient's specific problem, the physician may determine that it is reasonable and necessary to send a urine specimen to a clinical laboratory for testing.

---

[1] Drug rehabilitation centers and other point-of-care providers are not authorized to perform laboratory services under the federal Clinical Laboratory Improvement Amendments of 1988 ("CLIA"). POCT can only be performed by rehabilitation centers or other providers that receive a CLIA Certificate of Waiver to perform these tests. Under CLIA, waived tests such as POCT are simple laboratory procedures that have an insignificant risk of producing an erroneous result.
[2] Clinical laboratories that perform testing on specimens to assist in the detection, diagnosis and treatment of diseases must be licensed by CLIA and must do so in accordance with standards established by CLIA.

19

80.     Whether performed in the physician's office or in a clinical laboratory, if the result for the drugs of abuse in urine ("DAU") screening test is negative, the urine specimen is by definition negative and no further tests needs to be done.

81.     Drug-of-abuse testing for medical purposes may involve testing patients in drug programs or who are suspected to be abusers of controlled substances both to verify drug dependency and to monitor treatment progress.  Medical purposes of drug-of-abuse testing may also include compliance testing (is the patient taking or not taking a prescribed and potentially abusable drug) and overdose testing (is the patient's impairment a result of overdosing on an abusable drug).

82.     Depending upon the beneficiary's specific medical problem and the treating physician's management of that problem, the treating physician may order that confirmation of screened *positive* results be performed in a reflex fashion; or, the treating physician may order confirmation testing if the patient challenges *positive* screening result (e.g., the patient denies drug abuse).

83.     Confirmation testing is defined as a second test by an alternate chemical method to positively identify a drug or metabolite.  Confirmation testing is carried out on presumptively positive specimens as determined by the initial immunoassay screens.

84.     In general, the treating physician may determine a confirmatory drug test is medically reasonable and necessary within the following criteria:

a.     Where the results of the initial screening test are *positive* and the treating physician needs to use the results of a confirmation test in the management of the beneficiary's specific medical problem.

b.      Where the results of the initial screening test are *abnormal* and the treating physician needs to use the results of a confirmation test in the management of the beneficiary's specific medical problem.  Abnormal results would include a positive result for a drug not prescribed, a negative result for a prescribed drug, or a result inconsistent with the evaluation of the patient.

c.      Where the presence of a specific drug is materially relevant to the patient's specific medical problem, a drug screening panel that tests for the relevant drug is not available, and the treating physician needs to use the results of a confirmation test in the management of the beneficiary's specific medical problem.

85.     Regardless of the initial screening urine drug test results, confirmatory testing is **not reasonable and necessary** *unless* the treating physician (i) **ordered it and (ii) needs to use the** specific confirmation test **results in the management of the beneficiary's specific medical problem.**   42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).  *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).  Additionally, the treating physician who ordered the test is required to maintain documentation of the medical necessity in the beneficiary's medical record.   42 C.F.R. § 410.32(d)(2).

86.     Clinical diagnostic laboratories are typically capable of performing confirmation testing for numerous different substances, or analytes.   For Medicare purposes, confirmation testing for each analyte is billed as a separate test.  Although the cost varies by test, georgraphy, etc., Medicare and Medicaid are billed approximately $40.00 for each analyte tested (or confirmation test performed).    Accordingly, the Medicare reimbursement for confirmation

testing on one analyte is approximately $32.00; by extension the Medicare reimbursement for testing 64 analytes is approximately $2,048.

87.     Because testing each analyte is billed as a separate test, each analyte may be tested and billed only if it is independently reasonable and necessary.  At a minimum, the treating physician must order confirmation testing of the specific analyte and the treating physician must need the results of the specific analyte confirmation tests for the management of the beneficiary's specific medical problem.

**E.     THE FRAUDULENT AND FALSE BILLING**

> **A. PINNACLE'S CONFIRMATION TESTS.**

88.     Nearly all of the confirmation tests that Pinnacle billed to Medicare and Medicaid between June 1, 2014 and March 17, 2015 were false claims.  The confirmation tests were not reasonable and necessary because they were not needed for the management of the beneficiary's specific medical condition, and were not ordered by the treating physicians.

89.     All of the confirmation tests that were performed in 2014 that Pinnacle billed to Medicare and Medicaid are false claims, as all such tests were billed in violation of 42 USC § 1395l(h)(5)(A).  Pinnacle did not perform any of the confirmation tests; it referred all tests to other reference labs.  Pinnacle did not meet an exception to 42 USC § 1395l(h)(5)(A) in 2014. Likewise, it is unlikely that Pinnacle will meet an exception to 42 USC § 1395l(h)(5)(A) in 2015. If not, all of its 2015 confirmation tests were likewise billed in violation of 42 USC § 1395l(h)(5)(A).

> **I. THE CONFIRMATION TESTS WERE NOT REASONABLE AND NECESSARY BECAUSE THE RESULTS WERE NOT NEEDED FOR THE MANAGEMENT OF THE BENEFICIARIES' SPECIFIC MEDICAL PROBLEMS.**

22

90.     The Defendants' scheme is to cause Pinnacle to bill Medicare and Medicaid for every possible confirmation test on every specimen it receives.

91.     Regardless of the patient's diagnosis, regardless of the patient's prescribed medication, regardless of the results of the screening tests, Pinnacle routinely billed Medicare and Medicaid for every available confirmation test on nearly every specimen it received between June, 2014 and the present.

92.     The brazenness of the scheme is staggering.   Pinnacle billed Medicare and Medicaid for between 48 and 64 separate tests on nearly every specimen it received.   Some of the tests are for substances that are rarely encountered, except in very specific situations.   Other tests are for routine substances such as acetaminophen (Tylenol), nicotine and alcohol.

93.     To compound the absurdity, the confirmation testing is done regardless of the screen test results.   In fact, Pinnacle completely ignores the screen test results.   Nearly every urine specimen is confirmation tested for every available analyte, regardless of the screening test results; even where the screen test is 100% normal.   Pinnacle did not even bother to pretend that the confirmation testing was based on the screen test results.   On the contrary, confirmation test are routinely performed *before* the screen tests.

94.     Pinnacle did not perform any confirmation tests that it billed to Medicare and Medicaid between June, 2014 and the present.   Instead, it referred all confirmation testing to one of three separate reference labs.

   a.   Pacific Labs ("Pacific").   During the period from approximately June 2, 2014 through approximately September 15, 2014, nearly every specimen that was submitted to Pinnacle was sent to Pacific, who performed confirmation testing for each of the following 48 analytes (the "Pacific Custom Panel"):

23

| | | |
|---|---|---|
| Barbiturates | Cannabinoids | ethyl-glucuronide |
| 6-Acetyimorphine | 7-Aminoclozepam | 7-aminoclonazepam |
| Amitriptyline | Amphetamine | Benzoylecgonine |
| Buprenorphine | Carisoprodol | Codeine |
| Cyclobenzaprine | Desipramine | Doxepin |
| EDDI | Fentanyl | Gabapentin |
| Hyrdocodone | Hydromorphone | Hydroxyalprazolam |
| Hydroxyethylflurazepam | Hydroxytriazolam | Imipramine |
| Lorazepam | MDA | MDMA |
| Meperidine | Meprobamate | Methadone |
| Methamphetamine | methylphenidate | Morphine |
| Norbuprenorphine | Nordiazepam | Norfentanyl |
| Normeperidine | Nortriptyline | Oxezepam |
| Oxycodone | Oxymorphone | PCP |
| Phentermine | Pregabatin | Tapentadol |
| Temazepam | Tiamadol | Zolpidem |

Pinnacle billed each analyte as a separate test. Accordingly, Pinnacle billed Medicare and Medicaid for 48 separate confirmation tests on nearly every specimen, regardless of the beneficiary's diagnosis, prescription medications, or screen test results.

The following are representative examples of specimens that were tested by Pacific. Regardless of diagnosis, prescription medication, or screen test results, Pinnacle billed Medicare and Medicaid for 48 separate confirmation tests on each specimen:

| Accession Number | Pinnacle Client | Diagnosis Codes | Screen Test Results | Analytes Tested |
|---|---|---|---|---|
| 140804005 | 12 | V58.69, V58.83, 724.20 | Benzo+, Opiates+ | 48 |
| 140804006 | 12 | V58.69, V58.83, 780.52, 724.2, 300.00 | N/A | 48 |
| 140804012 | 12 | V58.69, V58.83, | N/A | 48 |

| | | 729.50 | | |
|---|---|---|---|---|
| 140807002 | 9 | V58.69, V58.83 | Benzo+ | 48 |
| 140807004 | 9 | V58.69, V58.83 | Oxycodoe+ | 48 |
| 140807007 | 9 | V58.69, V58.83 | Benzo+, Cocaine+, Opiates+ | 48 |
| 140808018 | 25 | 305.5 | N/A | 48 |
| 140808019 | 25 | 714.96, V58.69 | N/A | 48 |
| 140808023 | 25 | 721.7, V58.59 | N/A | 48 |
| 140808023 | 25 | 721.7, V58.69 | N/A | 48 |
| 140814004 | 9 | V58.69, V58.83 | Benzo+ | 48 |
| 140808029 | 25 | V58.69, 715.95 | N/A | 48 |
| 140808030 | 25 | V58.69, 729.50 | N/A | 48 |
| 140808039 | 25 | V58.69 | N/A | 48 |
| 140808042 | 25 | 719.47 | N/A | 48 |
| 140808044 | 25 | V58.69, 715.95, 722.10 | N/A | 48 |
| 140808051 | 25 | 304 | N/A | 48 |
| 140817005 | 9 | V58.69, V58.83 | Benzo+ | 48 |
| 140817006 | 9 | V58.69, V58.83 | Amph+, Benzo+ | 48 |
| 140817009 | 9 | V58.69, V58.83 | Benzo+ | 48 |
| 140812082 | 25 | 304, V58.59 | N/A | 48 |
| 140812085 | 25 | 304, V58.59 | N/A | 48 |
| 140812098 | 25 | 715.95, 715.96, V58.59 | N/A | 48 |
| 140813003 | 9 | V58.69, V58.83 | All Neg | 48 |
| 140813011 | 9 | V58.69, | All Neg | 48 |

25

| | | V58.83 | | |
|---|---|---|---|---|

   b.  Auspicious Laboratory ("Auspicious").   During the period from approximately
   September 15, 2015 through December 1 2014, nearly every specimen that was
   submitted to Pinnacle was sent to Auspicious, who performed confirmation
   testing for each of the following 53 analytes (the "Auspicious Custom Panel"):

| | | |
|---|---|---|
| Amphetamine | Citalopram | Methadone Metab.(EDDP) |
| Methamphetamine | Cyclobenzaprine | Propoxyphene |
| MDMA | Venlafaxine | Norpropoxyphene |
| MDA | Codeine | Meperidine |
| Alprazolam | Morphine | Normeperidine |
| alpha-hydroxyalprazolam | 6-Acetylmorphine | Tapentadol |
| Diazepam | Hydrocodone | Pentazocine |
| Oxazepam | Norydrocodone | Phencyclidine |
| Nordiazepam | Hydromorphone | Carboxyl-THC |
| Temazepam | Oxycodone | Cocaine Metabolite |
| Lorazepam | Noroxycodone | Ketamine |
| 7- Aminoclonazepam | Oxymorphone | Norketamine |
| Flurazepam | Fentanyl | Carisoprodol |
| Flunitrazepam | Norfentanyl | Meprobamate |
| Nortriptyline | Buprenorphine | Gabapentin |
| Desipramine | Norbuprenorphine | Zolpidem |
| Imipramine | Tramadol | Pregabalin |
| Doxepin | Methadone | |

   Pinnacle billed each analyte as a separate test.   Accordingly, Pinnacle billed
   Medicare and Medicaid for 53 separate confirmation tests on nearly every
   specimen, regardless of the beneficiary's diagnosis, prescription medications, or
   screen test results.

        The following are representative examples of specimens that were tested
   by Auspicious.   Regardless of diagnosis, prescription medication, or screen test
   results, Pinnacle billed Medicare and Medicaid for 53 separate confirmation tests
   on each specimen:

| Accession Number | Pinnacle Client | Diagnosis Codes | Screen Test Results | Analytes Tested |
|---|---|---|---|---|
| 141029003 | 12 | V58.69, V58.83 | All Neg | 53 |
| 140929047 | 12 | V58.69, V58.83 | Benzo+, Opiates+ | 53 |
| 141028006 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141002025 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141029008 | 12 | V58.69, V58.83 | Benzo+, Opiates+ | 53 |
| 141029007 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141029006 | 12 | V58.69, V58.83 | Benzo+, Opiates+ | 53 |
| 140926070 | 12 | V58.69, V58.83 | Benzo+, Amph | 53 |
| 141103006 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141103008 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141103013 | 12 | V58.69, V58.83 | Opiates+ | 53 |
| 141103011 | 12 | V58.69, V58.83 | Benzo+ | 53 |
| 141103012 | 12 | V58.69, V58.83 | Benzo+, Opiates+ | 53 |
| 141103010 | 12 | V58.69, V58.83 | Benzo+, Opiates+ | 53 |
| 141103008 | 12 | V58.69, V58.83 | All Neg | 53 |
| 141211009 | 9 | V58.69, V58.83 | NR | 53 |
| 141125005 | 9 | V58.69, V58.83 | NR | 53 |
| 141009020 | 9 | V58.69, V58.83 | NR | 53 |

| 141022127 | 9 | V58.69, V58.83 | NR | 53 |
|---|---|---|---|---|
| 141028023 | 9 | V58.69, V58.83 | NR | 53 |
| 150118021 | 7 | 789.00 | NR | 53 |
| 150118035 | 7 | 724.2 | NR | 53 |
| 140118078 | 7 | 724.2 | NR | 53 |
| 150118065 | 7 | 724.2 | NR | 53 |
| 150118037 | 7 | 724.2 | N/A | 53 |

c. Mission Diagnostics. During the period from on or about December 1, 2014 through the present, nearly every specimen that was submitted to Pinnacle was sent to Mission[3], who performed confirmation testing for each of the following 64 analytes (the "Mission Custom Panel"):

| | | |
|---|---|---|
| Amphetamine | 6-Acetylmorphine | Secobarbital |
| Methamphetamine | Hydrocodone | Carisoprodol |
| MDMA | Norhydrocodone | Meprobamate |
| MDME | Hydromorphone | Gabapentin |
| MDA | Oxycodone | Zolpidem |
| Methylphenidate | Oxymorphone | Pregabalin |
| Ritalinic Acid | Fentanyl | Zopiclone |
| Phentermine | Norfentanyl | Naloxone |
| Alprazolam | Sufentanil | Naltrexone |
| alpha-hydroxyalprazolam | Buprenorphine | Acetaminophen |
| Diazepam | Norbuprenorphine | Cotinine |

---

[3] At various times during this period, Mission has been overwhelmed by the volume of confirmation tests that Pinnacle has referred, such that Mission is unable to perform all of the tests. During those times, Pinnacle refers the overflow confirmation testing to Auspicious. When Auspicious performs the confirmation testing, Auspicious performs its 53-analyte Custom Panel, instead of Mission's 64-analyte Custom Panel. Again, the number of confirmation tests that Pinnacle bills to Medicare and Medicaid is solely dependent on the number of tests the applicable reference lab is capable of performing, not treatment of the patient's specific medical problems.

| | | |
|---|---|---|
| Nordiazepam | Tramadol | Ethyl Sulfate |
| Clonazepam | O-desmethyltramadol | Amitriptyline |
| 7- Aminoclonazepam | Methadone | Cyclobenzaprine |
| Oxazepam | Methadone Metab.(EDDP) | Nortriptyline |
| Temazepam | Propoxyphene | Cocaine |
| Lorazepam | Meperidine | Benzoylecgonine |
| Flunitrazepam | Normeperidine | Ketamine |
| Flurazepam | Tapentadol | Phencyclidine |
| Midazolam | Butalbital | THC (Marijuana) |
| Codeine | Pentobarbital | |
| Morphine | Phenobarbital | |

Pinnacle billed each analyte as a separate test.   Accordingly, Pinnacle billed Medicare and Medicaid for 64 separate confirmation tests on nearly every specimen, regardless of the beneficiary's diagnosis, prescription medications, or screen test results.

The following are representative examples of specimens that were tested by Mission.  Regardless of diagnosis, prescription medication, or screen test results, Pinnacle billed Medicare and Medicaid for 64 separate confirmation tests on each specimen:

| Accession Number | Pinnacle Client | Diagnosis Codes | Screen Test Results | Analytes Tested |
|---|---|---|---|---|
| 141203023 | 29 | V70.0 | N/A | 64 |
| 141203019 | 7 | 742.2 | N/A | 64 |
| 141202027 | 7 | 742.2 | N/A | 64 |
| 141203009 | 7 | 356.9 | N/A | 64 |
| 141203009 | 7 | 719.46 | N/A | 64 |

| | | | | |
|---|---|---|---|---|
| 141203014 | 7 | 724.2 | N/A | 64 |
| 141202035 | 7 | 723.4 | N/A | 64 |
| 141202036 | 7 | 724.2, 724.4 | N/A | 64 |
| 141203003 | 7 | 724.2 | N/A | 64 |
| 141203006 | 7 | 724.2 | N/A | 64 |
| 141212002 | 32 | 724.4, V58.69, V58.83 | N/A | 64 |
| 141202044 | 29 | 401.1, 729.50 | N/A | 64 |
| 141202046 | 29 | 401.1, 250.00 | N/A | 64 |
| 141203028 | 29 | 729.5 | N/A | 64 |
| 141203030 | 29 | 401.1 | N/A | 64 |
| 150112007 | 7 | N/A | N/A | 64 |
| 150112023 | 7 | N/A | N/A | 64 |
| 150122020 | 29 | N/A | N/A | 64 |
| 150112006 | 7 | N/A | N/A | 64 |
| 141203014 | 7 | N/A | N/A | 64 |
| 141202036 | 7 | N/A | N/A | 64 |
| 141230077 | 7 | N/A | N/A | 64 |
| 141230038 | 7 | N/A | N/A | 64 |
| 141111102 | 7 | 724.20 | N/A | 64 |
| 141230060 | 7 | N/A | N/A | 64 |

95.     Uday Shah negotiated a set price for the Custom Panel testing with each the three reference labs. Shah and Michelle Robicheaux, Shah's assistant, directed Relator to send a blank requisition to the applicable reference lab for each specimen Pinnacle received. They directed that the requisition identify only the patient information and not order any specific test. They likewise directed Mission to send requisitions to the reference labs for specimens that Pinnacle received through Mission. Shah issued a standing order to the three reference labs to perform the full Custom Panels identified above for each specimen that Pinnacle or Mission sent to the reference labs.

96.     Uday Shah directed ABN and Angie Newman to prepare and deliver Pinnacle's bills to Medicare and Medicaid, consisting of a charge for each confirmation test included in the Custom Panels for each specimen that Pinnacle received, directly or through Mission.

97.     Consistent with Shah's direction, ABN and Angie Newman prepared and delivered Pinnacle's bills to Medicare and Medicaid, consisting of a charge for each confirmation test included in the Custom Panels for each specimen that Pinnacle received, directly or through Mission.

98.     In the relatively few cases where Pinnacle received an order for a specific set of tests, Relator hand-wrote those tests on the requisition that Pinnacle sent to the reference lab. In nearly all cases, the Relator's hand-written instructions were ignored, the reference lab nonetheless performed the full Custom Panel, and Pinnacle nonetheless billed Medicare and Medicaid for each of the confirmation tests that made up the Custom Panel.

99.     Pinnacle's scheme to bill every possible confirmation test on every specimen made the screening tests irrelevant. In many cases, the confirmation test was performed before the screen test, so screen test results were not available. Where screen test results were available,

31

Pinnacle simply ignored them.  In either case, the confirmation tests were performed and billed to Medicare and Medicaid regardless of the screen test results.

100.    The following are representative examples where confirmation tests were performed before Pinnacle even performed the screening test.  Each example reflects 48, 53 or 64 separate tests that Pinnacle billed to Medicare and Medicaid:

| Acc # | Date of Service | Date of Confirmation Test | Date of Screen Test |
|---|---|---|---|
| 141218037 | 11/22/2014 | 12/9/2014 | 12/18/2014 |
| 141201054 | 11/13/2014 | 12/1/2014 | 12/2/2014 |
| 141028111 | 12/23/2014 | 10/31/014 | 11/5/2014 |
| 141022099 | 10/14/2014 | 10/26/2014 | 11/5/2014 |
| 141008015 | 9/16/2014 | 9/22/2014 | 10/8/2014 |
| 140929009 | 9/8/2014 | 9/22/2014 | 10/8/2014 |
| 140926020 | 9/13/2014 | 9/25/2014 | 9/29/2014 |
| 141028112 | 10/21/2014 | 10/31/2014 | 11/5/2014 |
| 141031073 | 10/20/2014 | 10/29/2014 | 11/10/2014 |
| 141113043 | 10/29/2014 | 11/17/2014 | 11/18/2014 |
| 141031126 | 10/22/2014 | 10/31/2014 | 11/10/2014 |
| 141008006 | 9/8/2014 | 9/22/2014 | 10/8/2014 |
| 141022101 | 10/16/2014 | 10/25/2014 | 11/5/2014 |
| 141022062 | 10/15/2014 | 10/26/2014 | 11/5/2014 |
| 141022018 | 10/4/2014 | 10/21/2014 | 10/23/2014 |
| 141031048 | 9/26/2014 | 10/6/2014 | 11/18/2014 |
| 141201046 | 11/18/2024 | 12/1/2014 | 12/2/2014 |
| 140929005 | 9/16/2014 | 9/25/2014 | 10/8/2014 |
| 141031053 | 9/27/2014 | 10/6/2014 | 11/13/2014 |
| 141022057 | 10/3/2014 | 10/21/2014 | 11/5/2014 |
| 141008044 | 9/9/2014 | 9/26/2014 | 10/9/2014 |
| 141113091 | 9/23/2014 | 10/2/2014 | 11/18/2014 |
| 141031044 | 10/8/2014 | 10/17/2014 | 11/18/2014 |
| 141031088 | 10/17/2014 | 10/29/2014 | 11/10/2014 |
| 140929007 | 9/16/2014 | 9/22/2014 | 10/8/2014 |

101.    As a result of ignoring the screening tests (and Shah's standing order to perform the full custom panel), Pinnacle routinely billed Medicare and Medicaid for confirmation testing of analytes that were specifically ruled out by the screening tests.   The following are representative examples of confirmation tests that Pinnacle billed to Medicare and Medicaid, where the screen tests specifically ruled out one or more of the billed tests.

| Accession Number | Clinic | Screen Test Results | Analytes Ruled Out By Screen Test | Analytes Tested and billed |
|---|---|---|---|---|
| 141002025 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141028006 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141029003 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |

| | | | | |
|---|---|---|---|---|
| 141029007 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103006 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103008 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103008 | 12 | All Neg | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, Codine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103011 | 12 | Benzo+ | Amphetamine, Methamphetamine, MDMA, MDA, Codeine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 140926070 | 12 | Benzo+, Amph | Codeine, Morphine, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |

| | | | | |
|---|---|---|---|---|
| 140929047 | 12 | Benzo+, Opiates+ | Amphetamine, Methamphetamine, MDMA, MDA, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141029006 | 12 | Benzo+, Opiates+ | Amphetamine, Methamphetamine, MDMA, MDA, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141029008 | 12 | Benzo+, Opiates+ | Amphetamine, Methamphetamine, MDMA, MDA, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103010 | 12 | Benzo+, Opiates+ | Amphetamine, Methamphetamine, MDMA, MDA, 6-Acetylmorphine, Hydrocodone, Norydrocodone, Hydromorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 141103013 | 12 | Opiates+ | Amphetamine, Methamphetamine, MDMA, MDA, Alprazolam, alpha-hydroxyalprazolam, Diazepam, Oxazepam, Nordiazepam, Temazepam, Lorazepam, 7-Aminoclonazepam, Flurazepam, Flunitrazepam, 6-Acetylmorphine, Oxycodone, Noroxycodone, Oxymorphone, Buprenorphine, Nonbuprenorphine, Methadone, EDDP, Cocaine Metabolite | Auspicious Custom Panel |
| 140807001 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |
| 140813003 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |

| | | | | |
|---|---|---|---|---|
| 140813006 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140813011 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140813015 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140813018 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140825023 | 9 | All Neg | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140817006 | 9 | Amph+, Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Norbuprenorphine, Oxycodone, Oxymorphone | Pacific Custom Panel |

| 140717028 | 9 | Amph+, Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Oxycodone, Oxymorphone | Pacific Custom Panel |
| 140717025 | 9 | Benzo, Bupr+, Opiates+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphemtamine | Pacific Custom Panel |
| 140807002 | 9 | Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140814004 | 9 | Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140817005 | 9 | Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140817009 | 9 | Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140717014 | 9 | Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140717015 | 9 | Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140717035 | 9 | Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140717036 | 9 | Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |

| | | | | |
|---|---|---|---|---|
| 140725049 | 9 | Benzo+, Bupr+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone,  Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140717018 | 9 | Benzo+, Bupr+, Methadone+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, Hyrdocodone, Hydromorphone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140825021 | 9 | Benzo+, Bupr+, Oxyc+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone,  Methadone, Morphine, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140807007 | 9 | Benzo+, Cocaine+, Opiates+ | Barbiturates, 6-Acetylmorphine, Buprenorphine, EDDP,  Methadone, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140804005 | 12 | Benzo+, Opiates+ | Barbiturates, 6-Acetylmorphine, Buprenorphine, EDDP,  Methadone, Norbuprenorphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine, Benzolecgonine | Pacific Custom Panel |
| 140813019 | 9 | Benzo+, Opiates+, Oxyc+ | Barbiturates, 6-Acetylmorphine, Buprenorphine, EDDP,  Methadone, Norbuprenorphine, MDA, MDMA, Amphetamine, Methamphetamine, Benzolecgonine | Pacific Custom Panel |
| 140717007 | 9 | Bupr+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,  Temazepam | Pacific Custom Panel |
| 140717011 | 9 | Bupr+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,  Temazepam | Pacific Custom Panel |

| | | | | |
|---|---|---|---|---|
| 140717021 | 9 | Bupr+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140717034 | 9 | Bupr+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone,   Temazepam | Pacific Custom Panel |
| 140825022 | 9 | Bupr+, Benzo+ | Barbiturates, 6-Acetylmorphine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone,   Methadone, Morphine, Oxycodone, Oxymorphone, MDA, MDMA, Amphetamine, Methamphetamine | Pacific Custom Panel |
| 140820019 | 9 | Bupr+, Cocaine+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA,  Methadone, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |
| 140825019 | 9 | Bupr+, Methadone+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methamphetamine, Morphine, Nordiazepam, Oxezepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |
| 140717026 | 9 | Bupr+, Opiates+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, EDDP, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Nordiazepam, Oxazepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |

| | | | | |
|---|---|---|---|---|
| 140717042 | 9 | Bupr+, Opiates+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, EDDP, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Nordiazepam, Oxazepam, Oxycodone, Oxymorphone, Temazepam | Pacific Custom Panel |
| 140725021 | 9 | Bupr+, Oxyc+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Nordiazepam, Temazepam | Pacific Custom Panel |
| 140825017 | 9 | Opiates+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, EDDP, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Nordiazepam, Oxazepam, Oxycodone, Oxymorphone, Temazepam, Buprenorphine, Norbuprenorphine | Pacific Custom Panel |
| 140807004 | 9 | Oxycodone+ | Barbiturates, 6-Acetylmorphine, 7-Aminoclozepam, 7-aminoflunitrazepam, Amphetamine, Benzoylecgonine, Buprenorphine, Codeine, EDDP, Hyrdocodone, Hydromorphone, Hydroxyalprazolam, Hydroxyethylflurazepam, Hydroxytriazolam, Lorazepam, MDA, MDMA, Methadone, Methamphetamine, Morphine, Norbuprenorphine, Nordiazepam, Oxezepam, Temazepam | Pacific Custom Panel |

102.    The only variable that determined the number of analytes that Pinnacle billed to Medicare and Medicaid was the reference lab that performed the testing: (a) if the specimen was sent to Pacific, Medicare and Medicaid were billed for 48 separate confirmation tests; (b) if the specimen was sent to Auspicious, Medicare and Medicaid were billed for 53 separate confirmation tests; and, (c) if the specimen was sent to Mission, Medicare and Medicaid were billed for 64 separate confirmation tests.

103.    This held true, even where the same patients were urine-tested on multiple dates, and the confirmation tests were performed by different reference labs.    The following are representative of patients who had multiple urine tests over time which were performed by different reference labs.  The patient and the diagnosis are the same for every urine test; the only change is the reference lab.  Nonetheless, when Pinnacle switched to a different reference lab, the panel of confirmation tests changed.  Where Pacific tested the specimen, Pinnacle billed Medicare and Medicaid for 48 separate confirmation tests; where Auspicious tested the specimen, Pinnacle billed Medicare and Medicaid for 53 separate confirmation tests; and, where Mission tested the specimen, Pinnacle billed Medicare and Medicaid for 64 separate confirmation tests.   In each case, the identity of the reference lab—not the patient's diagnosis— determined the number of confirmation tests that Pinnacle billed to Medicare and Medicaid.

41

**PATIENT 1:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717034 | 9 | 7/10/2014 | V58.69, V58.83 | Pacific | 48 |
| 140731019 | 9 | 7/24/2014 | V58.69, V58.83 | Pacific | 48 |
| 140801005 | 9 | 7/31/2014 | V58.69, V58.83 | Pacific | 48 |
| 140807004 | 9 | 8/6/2014 | V58.69, V58.83 | Pacific | 48 |
| 140825037 | 9 | 8/22/2014 | V58.69, V58.83 | Pacific | 48 |
| 140902006 | 9 | 8/28/2014 | V58.69, V58.83 | Pacific | 48 |
| 140908063 | 9 | 9/4/2014 | V58.69, V58.83 | Pacific | 48 |
| 140916116 | 9 | 9/11/2014 | V58.69, V58.83 | Auspicious | 53 |
| 141010040 | 9 | 10/9/2014 | V58.69, V58.83 | Auspicious | 53 |
| 141103031 | 9 | 10/30/2014 | V58.69, V58.83 | Auspicious | 53 |
| 141215002 | 9 | 12/11/2014 | V58.69, V58.83 | Mission | 64 |

**PATIENT 2:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140811028 | 7 | 7/29/2014 | N/A | Pacific | 48 |
| 140811028 | 7 | 8/26/2014 | N/A | Pacific | 48 |

| | | | | | |
|---|---|---|---|---|---|
| 140920024 | 7 | 9/29/2014 | N/A | Pacific | 48 |
| 114102331 | 7 | 10/22/2014 | N/A | Auspicious | 53 |
| 141203014 | 7 | 11/24/2014 | 724.2 | Mission | 64 |
| 150118037 | 7 | 12/22/2014 | 724.2 | Auspicious | 53 |

**PATIENT 3:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140725018 | 9 | 7/17/2014 | V58.69 | Pacific | 48 |
| 141028009 | 9 | 10/23/2014 | V58.69 | Auspicious | 53 |
| 150105007 | 9 | 12/18/2014 | V58.69 | Mission | 64 |

**PATIENT 4:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140904020 | 7 | 8/29/2014 | N/A | Pacific | 48 |
| 141111042 | 7 | 10/30/2014 | N/A | Auspicious | 53 |
| 150112023 | 7 | 12/17/2014 | 724.2 | Mission | 64 |

**PATIENT 5:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140731003 | 9 | 7/28/2014 | V58.69 | Pacific | 48 |
| 141022133 | 9 | 10/21/2014 | V58.69 | Auspicious | 53 |
| 141219012 | 9 | 12/15/2014 | V58.69 | Mission | 64 |

**PATIENT 6:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140825027 | 9 | 8/20/2014 | V58.69 | Pacific | 48 |
| 141114019 | 9 | 11/11/2014 | V58.69 | QNS | QNS |
| 141125010 | 9 | 11/21/2014 | V58.69 | Auspicious | 53 |
| 150105015 | 9 | 12/22/2014 | N/A | Mission | 64 |

**PATIENT 7:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140925023 | 7 | 9/16/2014 | N/A | Auspicious | 53 |
| 141022212 | 7 | 10/21/2014 | N/A | Auspicious | 53 |
| 141230077 | 7 | 11/25/2014 | N/A | Mission | 64 |
| 150118065 | 7 | 12/30/2014 | 724.2 | Auspicious | 53 |

**PATIENT 8:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717017 | 9 | 7/2/2014 | V58.69 | Pacific | 48 |
| 140801013 | 9 | 7/30/2014 | V58.69 | Pacific | 48 |
| 141022127 | 9 | 10/21/2014 | V58.69 | Auspicious | 53 |
| 141202009 | 9 | 11/25/2014 | V58.69 | Auspicious | 53 |
| 141211007 | 9 | 12/9/2014 | V58.69 | Mission | 64 |

**PATIENT 9:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140728017 | 7 | 7/21/2014 | N/A | Pacific | 48 |

| | | | | | |
|---|---|---|---|---|---|
| 140829007 | 7 | 8/11/2014 | N/A | Pacific | 48 |
| 140829008 | 7 | 8/29/2014 | N/A | Pacific | 48 |
| 140930044 | 7 | 9/24/2014 | N/A | Auspicious | 53 |
| 141023038 | 7 | 10/23/2014 | N/A | Auspicious | 53 |
| 150112037 | 7 | 12/17/2014 | N/A | Mission | 64 |

**PATIENT 10:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717023 | 9 | 7/1/2014 | V58.69 | Pacific | 48 |
| 140827006 | 9 | 8/26/2014 | V58.69 | Pacific | 48 |
| 141022122 | 9 | 10/21/2014 | V58.69 | Auspicious | 53 |
| 141219011 | 9 | 12/16/2014 | V58.69 | Mission | 64 |

**PATIENT 11:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717014 | 9 | 7/10/2014 | V58.69 | Pacific | 48 |
| 140813003 | 9 | 8/7/2014 | V58.69 | Pacific | 48 |
| 140908058 | 9 | 9/4/2014 | V58.69 | Pacific | 48 |
| 141006039 | 9 | 10/2/2014 | V58.69 | Auspicious | 53 |
| 150105027 | 9 | 12/23/2014 | V58.69 | Mission | 64 |

**PATIENT 12:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717025 | 9 | 7/15/2014 | V58.69 | Pacific | 48 |

| 140813018 | 9 | 8/12/2014 | V58.69 | Pacific | 48 |
| 140827005 | 9 | 8/26/2014 | V58.69 | Pacific | 48 |
| 140910037 | 9 | 9/8/2014 | V58.69 | Pacific | 48 |
| 141009008 | 9 | 10/6/2014 | N/A | Auspicious | 53 |
| 141107022 | 9 | 11/3/2014 | V58.69 | Auspicious | 53 |
| 141118006 | 9 | 11/17/2014 | V58.69 | Auspicious | 53 |
| 141201009 | 9 | 11/25/2014 | V58.69 | Auspicious | 53 |
| 141202002 | 9 | 12/1/2014 | V58.69 | Auspicious | 53 |
| 150105023 | 9 | 12/29/2014 | V58.69 | Mission | 64 |

**PATIENT 13:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140812153 | 7 | 8/6/2014 | N/A | Pacific | 48 |
| 141104008 | 7 | 10/23/2014 | N/A | Auspicious | 53 |
| 141203006 | 7 | 11/20/2014 | 724.2 | Mission | 64 |
| 150113082 | 7 | 12/19/2014 | 724.2 | Auspicious | 53 |

**PATIENT 14:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 141125005 | 9 | 11/24/2014 | V58.69 | Auspicious | 53 |
| 140825021 | 9 | 8/21/2014 | V58.69 | Pacific | 48 |
| 150105021 | 9 | 12/22/2014 | V58.69 | Mission | 64 |

**PATIENT 15:**

| Accession Number | Pinnacle Client | Collection Date | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140717015 | 9 | 7/15/2014 | V58.69 | Pacific | 48 |

| 140910028 | 9 | 9/9/2014 | V58.69 | Pacific | 48 |
| 141117002 | 9 | 11/14/2014 | V58.69 | Auspicious | 53 |
| 141216003 | 9 | 12/15/2014 | V58.69 | Mission | 64 |

104.    Pinnacle has been remarkably consistent in billing every available confirmation test on nearly every specimen it receives.   In fact, the only exceptions of which Relator is aware involved self-pay patients.  The following are examples of self-pay patients, where the reference lab performed only a limited number of confirmation tests.

| Accession Number | Client ID | Requisition | Reference Laboratory | Analytes Tested |
|---|---|---|---|---|
| 140820018 | 9 | "Confirm Buprenorphine Only" | Pacific | Buprenorphine, Norbuprenorphine |
| 140820021 | 9 | "Confirm Buprenorphine Only" | Pacific | Buprenorphine, Norbuprenorphine |
| 140825024 | 9 | "Confirm Buprenorphine Only" | Pacific | Buprenorphine, Norbuprenorphine |
| 140825025 | 9 | "Confirm Buprenorphine Only" | Pacific | Buprenorphine, Norbuprenorphine |

105.    Where specimens from self-pay patients did receive full confirmation testing, Pinnacle made no effort to bill or collect payment from the non-insured patients.

106.    In contrast, Pinnacle performed and billed every possible confirmation test on nearly every specimen it received from a Medicare or Medicaid beneficiary.  In fact, Relator is not aware of any Medicare or Medicaid patient that Pinnacle did not perform and bill for every test that the reference lab had available.

## II.  THE CONFIRMATION TESTS WERE NOT REASONABLE AND NECESSARY BECAUSE THE CONFIRMATION TESTS WERE NOT ORDERED BY THE TREATING PHYSICIANS.

107. Not only were the confirmation tests not needed for the management of the patients' specific medical problems, they were not ordered by the patients' treating physician.

108. Relator cannot recall an instance in which Pinnacle received a requisition or orders from a treating physician purporting to order the full Custom Panel tests that Pinnacle billed to Medicare and Medicaid.

109. Instead, the requisitions that Pinnacle received from treating physicians for Medicare and Medicaid patients generally fall into four classes: (1) blank requisitions; (2) "standing order" requisitions; (3) requisitions for specific screen tests; and, (4) no requisition or order of any type.

110. **Blank Requisitions**. One class of requisitions that Pinnacle received for Medicare and Medicaid beneficiaries during the relevant period were *blank*; that is, the requisitions did not identify any ordered test. Without an order for specific tests from the treating physician, the specimens were referred to a reference laboratory with directions to perform the full Custom Panel pursuant to the standing order that Shah had previously negotiated. Pinnacle billed Medicare and Medicaid for testing each of the analytes included in the Custom Panels. The following are representative examples of confirmation tests that Pinnacle billed to Medicare and Medicaid based on blank requisitions.

| Accession Number | Pinnacle Client | Requisition Type | Reference Laboratory | No. of Analytes Tested |
|---|---|---|---|---|
| 140905024 | 25 | Blank | Pacific | 48 |
| 140717001 | 9 | Blank | Pacific | 48 |
| 140717004 | 9 | Blank | Pacific | 48 |
| 140717007 | 9 | Blank | Pacific | 48 |
| 140717009 | 9 | Blank | Pacific | 48 |
| 140717011 | 9 | Blank | Pacific | 48 |
| 140717012 | 9 | Blank | Pacific | 48 |
| 140907016 | 25 | Blank | Pacific | 48 |

| 140907017 | 25 | Blank | Pacific | 48 |
|---|---|---|---|---|
| 140907027 | 25 | Blank | Pacific | 48 |
| 140919002 | 25 | Blank | Pacific | 48 |
| 141009020 | 9 | Blank | Auspicious | 53 |
| 141010039 | 9 | Blank | Auspicious | 53 |
| 141022127 | 9 | Blank | Auspicious | 53 |
| 141028023 | 9 | Blank | Auspicious | 53 |
| 141028027 | 9 | Blank | Auspicious | 53 |
| 141028028 | 9 | Blank | Auspicious | 53 |
| 141125005 | 9 | Blank | Auspicious | 53 |
| 141202027 | 7 | Blank | Mission | 64 |
| 141202035 | 7 | Blank | Mission | 64 |
| 141202036 | 7 | Blank | Mission | 64 |
| 141203003 | 7 | Blank | Mission | 64 |
| 141203006 | 7 | Blank | Mission | 64 |
| 141203009 | 7 | Blank | Mission | 64 |
| 141203009 | 7 | Blank | Mission | 64 |
| 141203014 | 7 | Blank | Mission | 64 |
| 141203019 | 7 | Blank | Mission | 64 |
| 141211009 | 9 | Blank | Mission | 64 |

Attached as **Exhibit 2** is a redacted copy of a representative example of a blank requisition, along with the confirmation test results showing the confirmation tests that Pinnacle billed to Medicare and Medicaid.

111. **"Standing Order" Requisitions**. A second class of requisitions that Pinnacle received for Medicare and Medicaid beneficiaries during the relevant period merely referred to a "*standing order*"; that is, the requisition did not identify any specific ordered test; it merely referred to a standing order. Without an order for specific tests from the treating physician, the specimens were referred to a reference laboratory with directions to perform the full Custom Panel pursuant to the standing order that Shah had previously negotiated. Pinnacle billed Medicare and Medicaid for each of the analytes included in the Custom Panels. The following

49

are representative examples of confirmation testing that Pinnacle billed to Medicare and Medicaid based on "standing order" requisitions:

| Accession Number | Provider | Requisition Type | Reference Laboratory | No. of Analytes Tested |
|---|---|---|---|---|
| 140926070 | 12 | Standing Order | Auspicious | 53 |
| 140929047 | 12 | Standing Order | Auspicious | 53 |
| 141002025 | 12 | Standing Order | Auspicious | 53 |
| 141028006 | 12 | Standing Order | Auspicious | 53 |
| 141029003 | 12 | Standing Order | Auspicious | 53 |
| 141029006 | 12 | Standing Order | Auspicious | 53 |
| 141029007 | 12 | Standing Order | Auspicious | 53 |
| 141029008 | 12 | Standing Order | Auspicious | 53 |
| 141103006 | 12 | Standing Order | Auspicious | 53 |
| 141103008 | 12 | Standing Order | Auspicious | 53 |
| 141103010 | 12 | Standing Order | Auspicious | 53 |
| 141103011 | 12 | Standing Order | Auspicious | 53 |
| 141103012 | 12 | Standing Order | Auspicious | 53 |
| 141103013 | 12 | Standing Order | Auspicious | 53 |
| 140922010 | 9 | Standing Order | Auspicious | 53 |
| 141002009 | 9 | Standing Order | Auspicious | 53 |
| 141002015 | 9 | Standing Order | Auspicious | 53 |
| 141028009 | 9 | Standing Order | Auspicious | 53 |
| 141028018 | 9 | Standing Order | Auspicious | 53 |
| 141103016 | 9 | Standing Order | Auspicious | 53 |
| 141103031 | 9 | Standing Order | Auspicious | 53 |
| 141107021 | 9 | Standing Order | Auspicious | 53 |
| 141107022 | 9 | Standing Order | Auspicious | 53 |
| 141107025 | 9 | Standing Order | Auspicious | 53 |
| 141114038 | 9 | Standing Order | Auspicious | 53 |

Attached as **Exhibit 3** is a redacted copy of a representative example of a "standing order" requisition, along with the confirmation test results showing the confirmation tests that Pinnacle billed to Medicare and Medicaid.

112. **Requisitions for Specific Screening Tests**. A third class of requisitions that Pinnacle received for Medicare and Medicaid beneficiaries during the relevant period ordered only *specific screening tests*; that is, the requisitions did not order confirmation tests; they ordered only specific screening tests. These specific orders were routinely ignored, and instead the full Custom Panel testing was performed pursuant to the standing order that Shah had previously negotiated. In some cases, Mission created false requisitions that purported to order full Custom Panel testing. In nearly every case, in direct contravention of the treating physician's specific orders, the specimens were nonetheless referred to a reference laboratory with directions to perform the full Custom Panels pursuant to the standing order that Shah had previously negotiated. Pinnacle billed Medicare and Medicaid for each of the analytes included in the Custom Panels. The following are representative examples of confirmation testing that Pinnacle billed to Medicare and Medicaid based on specific-screen-test requisitions:

| Accession Number | Requisition Type | Reference Laboratory | No. of Analytes Tested |
|---|---|---|---|
| 141202044 | Specific Screen | Mission | 64 |
| 141202046 | Specific Screen | Misson | 64 |
| 141203028 | Specific Screen | Misson | 64 |
| 141203030 | Specific Screen | Misson | 64 |
| 141203023 | Specific Screen | Misson | 64 |
| 141212002 | Specific Screen | Misson | 64 |

Attached as **Exhibit 3** is a redacted copy of a representative example of a requisition for specific screening tests, along with the confirmation test results showing the confirmation tests that Pinnacle billed to Medicare and Medicaid.

51

113.    **No Requisition**.  A fourth class is where Pinnacle received no requisition or order of any type.  Several physicians deliver specimens directly to Mission, not Pinnacle.  Pinnacle typically receives no requisition or order of any type from the treating physician for these specimens.

  a.  If a screen test is required, Mission splits the urine specimen into two samples: Mission keeps one sample, from which it performs (or causes Pacific or Auspicious to perform) full Custom Panel confirmation testing.   Mission Diagnostics sends the "other" sample to Pinnacle with directions to perform the screen test.

  b.  If no screen test is required, Mission performs (or causes another reference lab to perform) the full Custom Panel of confirmation tests, and Pinnacle receives no portion of the subject urine sample.

114.    In both cases, Pinnacle almost never receives a requisition or order of any type from the treating physician.  When it does receive a requisition, it is typically not from the treating physician; instead it is a "requisition" that Mission manufactured.  Although Pinnacle receives almost no physician requisitions for the specimens routed through Mission, the specimens are nonetheless referred to one of the three reference labs, who then performs a full Custom Panel of confirmation tests, for which Pinnacle bills Medicare and Medicaid.   The following are representative examples of confirmation tests that Pinnacle billed to Medicare and Medicaid where it received no requisition or order of any type:

| Accession Number | MD | Requsition | Test(s) Orderd | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140813040 | 25 | N/A | N/A | Pacific | 48 |
| 140813048 | 25 | N/A | N/A | Pacific | 48 |

52

| 140814013 | 25 | N/A | N/A | Pacific | 48 |
| 140829052 | 7 | N/A | N/A | Pacific | 48 |
| 140909016 | 25 | N/A | N/A | Pacific | 48 |
| 140910014 | 25 | N/A | N/A | Pacific | 48 |
| 140910035 | 25 | N/A | N/A | Pacific | 48 |
| 140910042 | 25 | N/A | N/A | Pacific | 48 |
| 140911002 | 25 | N/A | N/A | Pacific | 48 |
| 140911010 | 25 | N/A | N/A | Pacific | 48 |
| 140916152 | 25 | N/A | N/A | Pacific | 48 |
| 140926085 | 25 | N/A | N/A | Auspicious | 53 |
| 141002036 | 25 | N/A | N/A | Auspicious | 53 |
| 141006056 | 25 | N/A | N/A | Auspicious | 53 |
| 141006059 | 25 | N/A | N/A | Auspicious | 53 |
| 141008065 | 25 | N/A | N/A | Auspicious | 53 |
| 141016014 | 28 | N/A | N/A | Auspicious | 53 |
| 141022014 | 20 | N/A | N/A | Auspicious | 53 |
| 141022029 | 20 | N/A | N/A | Auspicious | 53 |
| 141022031 | 20 | N/A | N/A | Auspicious | 53 |
| 150112024 | 7 | N/A | N/A | Mission | 64 |
| 150112028 | 7 | N/A | N/A | Mission | 64 |
| 150112037 | 7 | N/A | N/A | Mission | 64 |
| 150113098 | 7 | N/A | N/A | Mission | 64 |
| 150122020 | 29 | N/A | N/A | Mission | 64 |

115.    The analytes in the Custom Panels are wide ranging.  It is expected that treating physicians pick and choose individual confirmation tests, if at all, depending upon screen test results and which specific test results are necessary for management of their patient's specific medical problem.  It is not reasonable and necessary to order the entire testing menu—certainly not in every case—as Shah and Pinnacle did throughout the relevant period.

116.    For example, the Mission Custom Panel includes tests for acetaminophen, nicotine, alcohol.  While it is possible these substances could be medically significant in certain circumstances, knowledge about their presence is not needed for the management of most medical problems.

117.    Additionally, the Custom Panels include tests for analytes that are rarely encountered, absent very specific situations.   For example, Phencyclidine, Ketamine, Norketamine, Propoxyphene, and Norpropoxyphene are so rarely encountered that Relator has rarely, if ever, seen a single positive result in 10 years of laboratory testing.

118.    Routinely performing and billing the entire Custom Panel menu amounts to a general, routine examination performed without relationship to treatment or diagnosis for a specific illness, symptom, complaint, or injury.  Such tests are not reasonable and necessary.  42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 16, § 90 (2014); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).

119.    Relator has repeatedly asked Defendants Uday Shah & Michelle Robichaux for orders from the treating physicians for the Custom Panels; Defendants responded that the treating physicians had issued "standing orders" for the Custom Panels that applied to all patients.   Relator has repeatedly asked the Defendants for copies of the alleged "standing orders", but Defendants have never produced the "standing orders".   42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).  *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).

120.    On information and belief, standing orders from the treating physicians do not exist.  Even if such alleged standing orders did exist, they would not support the claim that the Custom Panels were reasonable and necessary, as the tests do not relate to the individual beneficiary's specific medical problems, and there is no evidence that the treating physicians needed the results of *each* analyte confirmation test in the management of the beneficiary's specific medical problem.

121.    Although the precise cost varies by test, Pinnacle billed Medicare and Medicaid approximately $40.00 for each analyte included in the Custom Panels.  The total approximate amount that Pinnacle billed to Medicare and Medicaid for each specimen were as follows: (a) the Pacific Custom Panel (48 separate analyte tests at $40.00 per test)—-$1,920.00; (b) the Auspicious Custom Panel (53 separate analyte tests at $40.00 per test)—$2,120.00; and, (c) the Mission Custom Panel (64 separate analyte tests at $40.00 per test)—-$2,560.00.

122.    Pinnacle has no documentation from the treating physicians ordering the Custom Panels; no documentation that the treating physicians needed to use the results of the Custom Panels in the management of the beneficiary's specific medical problems; no documentation that the Custom Panel tests were reasonable and necessary; and no documentation suggesting that the information Pinnacle submitted with the claims to Medicare and Medicaid for the Custom Panels accurately reflected the information it received from the treating physicians.   42 C.F.R. § 410.32(d)(2).

### III.   PINNACLE BILLED ALL OF THE 2014 CONFIRMATION TESTS IN VIOLATION OF 42 USC § 1395L(H)(5)(A); LIKEWISE, IT IS UNLIKELY THAT PINNACLE WILL MEET AN EXCEPTION TO THE STATUTE IN 2015; IF SO, IT ALSO BILLED THE 2015 CONFIRMATION TESTS IN VIOLATION OF THE STATUTE.

123.    All confirmation tests that were performed in 2014 were false claims, as they were billed in violation of 42 USC § 1395l(h)(5)(A).

124.    Pinnacle did not perform any of the confirmation tests; it referred every confirmation test to another reference lab (Pacific, Auspicious or Mission).

125.    During 2014, Pinnacle did not meet an exception to 42 U.S.C. 1395l (h)(5)(A):

    a.   Pinnacle is not located in, or part of, a rural hospital.

b. Pinnacle is not wholly-owned by any of the reference laboratories to which it referred tests; none of the reference laboratories to which Pinnacle referred tests wholly-owns Pinnacle; and, Pinnacle and the reference laboratories are not wholly-owned by a third entity.

c. More than 30 percent of the clinical diagnostic laboratory tests for which Pinnacle received requests for testing during 2014 were performed by other laboratories.

42 U.S.C. 1395l(h)(5)(A); Medicare Claims Processing Manual, Chapter 16 § 40.1.

126.   Likewise, it is unlikely that Pinnacle will meet an exception to 42 USC § 1395l(h)(5)(A) in 2015.  If not, all of the 2015 confirmation tests that Pinnacle has billed to Medicare and Medicaid were also billed in violation of 42 USC § 1395l(h)(5)(A).

127.   42 U.S.C. 1395l(h)(5)(A) prohibits Pinnacle from billing Medicare and Medicaid for any tests that Pinnacle does not actually perform.  42 U.S.C. 1395l(h)(5)(A); Medicare Claims Processing Manual, Chapter 16 § 40.1.

128.   42 U.S.C. 1395l(h)(5)(A) is a condition of payment.

129.   Additionally, Pinnacle falsely certified to Medicare and Medicaid that it actually performed the confirmation tests.

130.   During the early stages of the scheme, ABN Billing and Angie Newman prepared Pinnacle's bills to reflect that the confirmation tests had been performed by a reference lab, not Pinnacle.  However, after the claims began to be rejected, ABN Billing and Angie Newman prepared Pinnacle's bills to falsely claim that Pinnacle had performed the confirmation testing. Specifically, item 20 on CMS Form 1500 is marked "no"; item 32 does not identify the service facility location information and CLIA number for the reference lab that actually performed the

confirmation testing; item 24 does not use modifier 90 to reflect that Pinnacle (the billing laboratory) is the referring laboratory, not the reference laboratory.

131.    All of the bills that Pinnacle submitted to Medicare and Medicaid that claimed that Pinnacle performed the confirmation tests are false claims.

### B. PINNACLE'S SCREEN TESTS.

#### i.    THE SCREEN TESTS WERE NOT REASONABLE AND NECESSARY BECAUSE THE TEST RESULTS WERE NOT REPORTED TO THE TREATING PHYSICIANS.

132.    Nearly all of the screen tests that Pinnacle performed were not reasonable and necessary because the test results were not reported to the treating physicians and, therefore, were not used for the management of the beneficiaries' specific medical problems. 42 C.F.R. § 410.32.  Specifically, Pinnacle has not promptly reported screen test results to Dr. Charles Turner since approximately September 15, 2014; and, Pinnacle has never reported screen test results to Dr. Fadi Ghanem.

133.    Uday Shah directed that the screening test results not be reported to the treating physicians.

134.    Likewise, because the treating physician did not receive the screen test results, the treating physician could not use the screen test results to determine whether to order further confirmatory tests.

135.    Pinnacle summarized screening test results for billing, audit and CLIA inspection purposes; the results were not used for the management of the beneficiaries' specific medical problems.

136.    As directed by Uday Shah and Angie Newman, each month Relator emails Angie Newman a summary of all screening tests run by Pinnacle for billing purposes.

137.    By way of representative example, during the relevant period, Pinnacle billed Medicare and Medicaid for the following screen tests, even though it did not communicate the test results to the treating physician:

| Accession Number | Pinnacle Client | Reference Laboratory |
|---|---|---|
| 150115001 | 9 | Auspicious |
| 141028009 | 9 | Auspicious |
| 141208006 | 9 | Auspicious |
| 150105001 | 9 | Mission |
| 141006033 | 9 | Auspicious |
| 141219012 | 9 | Mission |
| 140922021 | 9 | Auspicious |
| 150105022 | 9 | Mission |
| 141201007 | 9 | Auspicious |
| 141125010 | 9 | Auspicious |
| 141121006 | 9 | Auspicious |
| 141114046 | 9 | Auspicious |
| 141209007 | 9 | Auspicious |
| 141009017 | 9 | Auspicious |
| 141002018 | 9 | Auspicious |
| 150122010 | 9 | Auspicious |
| 141211009 | 9 | Mission |
| 150105002 | 9 | Mission |
| 14111703 | 9 | Auspicious |
| 150115003 | 9 | Auspicious |
| 141219011 | 9 | Mission |
| 141208001 | 9 | Auspicious |
| 141107021 | 9 | Auspicious |
| 141211011 | 9 | Mission |
| 141204009 | 9 | Auspicious |

138.    The screen tests were not reasonable and necessary because the treating physician did not use the results in the management of the beneficiary's specific medical problem.  42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).  *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).

### ii. THE SCREEN TESTS WERE NOT REASONABLE AND NECESSARY BECAUSE THE TESTS WERE ROUTINELY PERFORMED *AFTER* THE CONFIRMATION TESTS.

139.  Pinnacle routinely billed Medicare and Medicaid for screening tests that were performed *after* the reference laboratory had already completed the Custom Panels confirmation tests.  The Custom Panels include tests for all of the analytes included in the screening test; so the belated screen tests results were redundant.  Performing screen tests after completing confirmatory tests is not reasonable and necessary because the treating physician does not need the redundant results from the screen test results for management of the beneficiary's specific medical problem.  42 C.F.R. 410.32(a); 42 U.S.C. § 1395y(a)(l)(A); Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).  *See also* Medicare Benefit Policy Manual, Chapter 15, §§ 80.6.2, 80.6.3 (2014).

140.  The following are representative examples of screen tests that were billed to Medicare and Medicaid even though confirmation tests had already been performed on the specimen.

| Acc # | Date of Service | Date of Confirmation Test | Date of Screen Test |
|---|---|---|---|
| 141008015 | 9/16/2014 | 9/22/2014 | 10/8/2014 |
| 140929009 | 9/8/2014 | 9/22/2014 | 10/8/2014 |
| 141008006 | 9/8/2014 | 9/22/2014 | 10/8/2014 |
| 140929007 | 9/16/2014 | 9/22/2014 | 10/8/2014 |
| 140926020 | 9/13/2014 | 9/25/2014 | 9/29/2014 |
| 140929005 | 9/16/2014 | 9/25/2014 | 10/8/2014 |
| 141008044 | 9/9/2014 | 9/26/2014 | 10/9/2014 |
| 141113091 | 9/23/2014 | 10/2/2014 | 11/18/2014 |
| 141031048 | 9/26/2014 | 10/6/2014 | 11/18/2014 |
| 141031053 | 9/27/2014 | 10/6/2014 | 11/13/2014 |
| 141031044 | 10/8/2014 | 10/17/2014 | 11/18/2014 |
| 141022018 | 10/4/2014 | 10/21/2014 | 10/23/2014 |
| 141022057 | 10/3/2014 | 10/21/2014 | 11/5/2014 |

| 141022101 | 10/16/2014 | 10/25/2014 | 11/5/2014 |
| 141022099 | 10/14/2014 | 10/26/2014 | 11/5/2014 |
| 141022062 | 10/15/2014 | 10/26/2014 | 11/5/2014 |
| 141031073 | 10/20/2014 | 10/29/2014 | 11/10/2014 |
| 141031088 | 10/17/2014 | 10/29/2014 | 11/10/2014 |
| 141028112 | 10/21/2014 | 10/31/2014 | 11/5/2014 |
| 141031126 | 10/22/2014 | 10/31/2014 | 11/10/2014 |
| 141113043 | 10/29/2014 | 11/17/2014 | 11/18/2014 |
| 141201054 | 11/13/2014 | 12/1/2014 | 12/2/2014 |
| 141201046 | 11/18/2024 | 12/1/2014 | 12/2/2014 |
| 141218037 | 11/22/2014 | 12/9/2014 | 12/18/2014 |
| 141028111 | 12/23/2014 | 10/31/014 | 11/5/2014 |

### iii.  PINNACLE BILLED FOR SCREEN TESTS THAT IT NEVER PERFORMS, OR PERFORMED SO LATE TO BE WORTHLESS.

141.   Additionally, Pinnacle billed Medicare and Medicaid for screen tests that it never performed, or were performed so late as to be worthless.  For example, in January, 2015, Relator contacted Kim Nicholson and advised her that Pinnacle had not received urine specimens from Dr. Ghanem in several weeks and inquired whether there had been a change in the process.  Dr. Fadi Ghanem is one of the physicians who sends specimens directly to Mission, not Pinnacle. Ms. Nicholson advised that there had not been a change and that Pinnacle should have received numerous specimens from Dr. Ghanem.  Relator followed up with Michelle Robicheux.  She advised that she would look into why Pinnacle was not receiving the samples and get back to Relator.

142.   After passage of more time, Relator eventually followed up with Ms. Nicholson to check on the status of the specimens from Dr. Ghanem.  Ms. Nicholson advised that Mission and ABN had discovered that Mission's new specimen processors had not been pouring off Dr. Ghanem's specimens and sending a sample to Pinnacle for screen testing.  Instead, the entire

60

specimen had been retained at Mission and used to perform the Mission Custom Panel confirmation testing.   Angie Newman advised Ms. Nicholson that Pinnacle, through ABN Billing, had already billed for the screening tests, even though the specimens had not been sent to Pinnacle, and Pinnacle had not performed the screen tests.   Moreover, Mission had already performed unordered confirmation tests on the specimens (the Mission Custom Panel).

143.   After discovering the false billings, instead of refunding Medicare's and Medicaid's payments for the unperformed screen tests, Defendants elected to search through Mission's storage areas trying to locate any left-over specimens so that Pinnacle could perform a belated screen test.   Since then, Mission Diagnostics has located a portion of the specimens, pulled them out of frozen storage, and sent them to Pinnacle to retrospectively run screening tests.   The belated screen tests have no medical purpose, as the results will not be used in the management of the patients' specific medical problems; instead, the purpose of the belated tests is to paper the files in case of an audit.

144.   Consistent with those conversations, on January 29, 2015, Pinnacle received an unusually large batch of approximately 120 specimens from Dr. Ghanem, many dating back to January 1st.   On information and belief, many of the specimens Pinnacle received on January 29th are part of specimens that Pinnacle/ABN Billing had already billed for unperformed screen tests. The rest of the specimens are unaccounted for.

145.   Upon Pinnacle receiving the large batch of Ghanem specimens, Relator contacted Michelle Robicheux about the necessity of retrospectively running screens in light of the fact that confirmation testing had already been performed.   Ms. Robicheux instructed Relator to run the screens and said: "we have to have them [the screening results] to bill for the confirmations".

61

146.    All of the billings for the Ghanem screen tests are false claims.  Most of the screen tests were never performed.  Moreover, even the few that are belatedly performed are false claims because the late-performed screen tests were not reasonable and necessary.  Clinical lab services must be ordered and used *promptly* by the physician who is treating the beneficiary as described in 42 CFR § 410.32(a).  Medicare Benefit Policy Manual, Chapter 15, § 80.1 (2014).

147.    These Ghanem screen tests are not reasonable and necessary because the results were so late that they could not be used for the treatment of the beneficiary's specific medical problem.  The results were so late that the tests were worthless.

C.    **VIOLATION OF THE ANTI-KICKBACK STATUTE**

148.    During the relevant period, Defendants offered and provided illegal kickbacks to health care providers in exchange for the providers referring their patients' urine screening and confirmatory testing to Pinnacle.

149.    Physicians often choose to perform POCTs because they can quickly perform the test in their office and get immediate results.

150.    Medicare and Medicaid reimburse the treating physician roughly $20 for each POCT test.  The POCT cups typically cost the treating physician in the range of $5-$8 per cup.  Likewise, the treating physician must have a CLIA certificate of waiver to bill Medicare and Medicaid for POCT testing.

151.    Conversely, Medicare and Medicaid reimburse clinical laboratories, such as Pinnacle, approximately $150 for each EIA screening test.

152.    Medicare and Medicaid will reimburse for a POCT test *or* an EIA screening test; they will *not* reimburse for both.  Accordingly, if a treating physician bills Medicare and

62

Medicaid for a POCT test, Pinnacle would be deprived of the opportunity to bill Medicare and Medicaid for the more expensive EIA screening test.

153.   Treating physicians appreciate that POCT tests yield immediate results, thereby allowing the treating physician to make real-time decisions concerning the management of the patient's specific medical problems.   Given this advantage, some physicians would choose to perform and bill Medicare and Medicaid for in-office POCT testing, thereby depriving Pinnacle of the opportunity to bill Medicare and Medicaid for the more expensive EIA screening test. More importantly to Pinnacle, some physicians would determine that it was not reasonable and necessary to order additional testing of specimens that had tested normal.   In such cases, Pinnacle would not receive the urine specimen and would thereby be deprived of the opportunity to bill Medicare and Medicaid for the much more expensive Custom Panel confirmatory tests (albeit falsely and fraudulently).

154.   The Defendants routinely provide Pinnacle's treating-physician clients [e.g. Client ID 28 &9], directly or indirectly, with free POCT cups in exchange for referring the more lucrative testing to Pinnacle.

155.   The Defendants maintain a log book of clients who pick up or are delivered the "free" POCT cups.   The log book is in the exclusive possession of one or more of the Defendants.

156.   By providing the treating physicians with free POCT cups, the treating physician obtains POCT testing's real-time tests results at no cost, and Pinnacle bills Medicare and Medicaid for the more expensive EIA screening test.

157.   Treating physicians received remuneration for referring drug testing to Pinnacle. Attached as **Exhibit 1** is a redacted copy of a representative requisition in which the treating

63

physicians disclosed to their Medicare and Medicaid patients that he or she (the treating physician) is receiving remuneration for referring the laboratory test services to Pinnacle.

158.   By way of representative example, during the relevant period, Pinnacle billed Medicare and Medicaid for the following tests which were referred to Pinnacle by physicians who disclosed that they were receiving remuneration for referring the tests to Pinnacle:

| Accession Number | Collection Date | MD | Screen Performed by Pinnacle | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 140801013 | 7/30/2014 | 9 | Yes | Pacific | 48 |
| 140804001 | 8/1/2014 | 9 | Yes | Pacific | 48 |
| 140807001 | 8/4/2014 | 9 | Yes | Pacific | 48 |
| 140807002 | 8/5/2014 | 9 | Yes | Pacific | 48 |
| 140807004 | 8/6/2014 | 9 | Yes | Pacific | 48 |
| 140807007 | 8/5/2014 | 9 | Yes | Pacific | 48 |
| 140807012 | 9/2/2014 | 9 | Yes | Pacific | 48 |
| 140813003 | 8/7/2014 | 9 | Yes | Pacific | 48 |
| 140813006 | 8/7/2014 | 9 | Yes | Pacific | 48 |
| 140825042 | 8/21/2014 | 9 | Yes | Pacific | 48 |
| 140902019 | 8/19/2014 | 15 | No | Pacific | 48 |
| 140902022 | 8/26/2014 | 15 | No | Pacific | 48 |
| 140903008 | 8/25/2014 | 15 | No | Pacific | 48 |
| 140903012 | 8/26/2014 | 15 | No | Pacific | 48 |
| 140903019 | 8/26/2014 | 15 | No | Pacific | 48 |
| 140903020 | 8/22/2014 | 15 | No | Pacific | 48 |
| 140905024 | 8/19/2014 | 15 | No | Pacific | 48 |
| 140905073 | 8/19/2014 | 15 | No | Pacific | 48 |
| 140905075 | 8/19/2014 | 15 | No | Pacific | 48 |
| 140907003 | 8/21/2014 | 15 | No | Pacific | 48 |
| 140907005 | 8/22/2014 | 15 | No | Pacific | 48 |
| 140907007 | 8/21/2014 | 15 | No | Pacific | 48 |
| 140907012 | 8/22/2014 | 15 | No | Pacific | 48 |
| 140907013 | 8/21/2014 | 15 | No | Pacific | 48 |
| 140907014 | 8/21/2014 | 15 | No | Pacific | 48 |
| 140907016 | 8/21/2014 | 15 | No | Pacific | 48 |
| 140907017 | 8/20/2014 | 15 | No | Pacific | 48 |
| 140907027 | 8/19/2014 | 15 | No | Pacific | 48 |
| 140926070 | 9/25/2014 | 12 | Yes | Auspicious | 53 |

| 140929047 | 9/26/2014 | 12 | Yes | Auspicious | 53 |
| 141002025 | 9/29/2014 | 12 | Yes | Auspicious | 53 |
| 141009020 | 10/7/2014 | 9 | Yes | Auspicious | 53 |
| 141010039 | 10/9/2014 | 9 | Yes | Auspicious | 53 |
| 141022127 | 10/21/2014 | 9 | Yes | Auspicious | 53 |
| 141028006 | 10/24/2014 | 12 | Yes | Auspicious | 53 |
| 141028023 | 10/22/2014 | 9 | Yes | Auspicious | 53 |
| 141028027 | 10/22/2014 | 9 | Yes | Auspicious | 53 |
| 141028028 | 10/22/2014 | 9 | Yes | Auspicious | 53 |
| 141029003 | 10/27/2014 | 12 | Yes | Auspicious | 53 |
| 141029006 | 10/28/2014 | 12 | Yes | Auspicious | 53 |
| 141029007 | 10/28/2014 | 12 | Yes | Auspicious | 53 |
| 141029008 | 10/27/2014 | 12 | Yes | Auspicious | 53 |
| 141103006 | 10/30/2014 | 12 | Yes | Auspicious | 53 |
| 141103008 | 10/29/2014 | 12 | Yes | Auspicious | 53 |
| 141103010 | 10/29/2014 | 12 | Yes | Auspicious | 53 |
| 141103011 | 10/29/2014 | 12 | Yes | Auspicious | 53 |
| 141103012 | 10/29/2014 | 12 | Yes | Auspicious | 53 |
| 141103013 | 10/28/2014 | 12 | Yes | Auspicious | 53 |
| 141125005 | 11/24/2014 | 9 | Yes | Auspicious | 53 |
| 141211009 | 12/9/2014 | 9 | Yes | Mission | 64 |

159.    Additionally, on information and belief, Defendants directly or indirectly paid health care providers money for drug testing referrals.

160.    In one instance, in or about May, 2014, a potential client reported to Relator that Uday Shah promised cash kickbacks in exchange for testing referrals.  The potential client had a prior relationship with Pinnacle, prior to Uday Shah purchasing the business.   The potential client was also an owner of Pinnacle Client ID 2.  After Uday Shah purchased Pinnacle, Relator went to the Pinnacle office to be trained by Michelle Robichaux (Dr. Shah's assistant) on the operation of Pinnacle's chemical analyzer.  Relator ran into the potential client in the parking lot. After speaking briefly about how things were going at the lab, the potential client stated that Dr. Shah had promised him kickbacks once Client ID 2 started sending urine samples for testing.

The potential client asked that Relator hurry up and get the lab back up and running, and "make Dr. Shah some money", and the potential client would ensure that Relator made money as well.

161.    Kim Nicholson is an employee of Defendant, ABN Billing Company, LLC. Kim is permanently stationed at Mission Diagnostic's office in Houston. Her role is similar to an administrative assistant. Kim and Relator work closely together and regularly communicate. In October, 2014, Kim Nicholson represented to Relator by phone that she delivered checks to Pinnacle Client ID 9's office contemporaneous with specimen pick-ups from his office. Prior to picking up urine specimens for testing from Pinnacle Client ID 9, Ms. Nicholson reported that she was required to wait for Michelle Robichaux to cut a check from MLS Upper Management, LLC.

162.    By way of representative example, Pinnacle billed Medicare and Medicaid for the following tests referred to Pinnacle by Client ID 9 after the October, 2014 payment from MLS Upper Management was delivered:

| Accession Number | Collection Date | Pinnacle Client ID | ICD | Reference Lab | No. Analytes Performed by Ref Lab |
|---|---|---|---|---|---|
| 141203019 | 11/21/2014 | 9 | 742.2 | Mission | 64 |
| 141202036 | 11/24/2014 | 9 | 724.2, 721.3 | Mission | 64 |
| 141203003 | 11/24/2014 | 9 | 724.2 | Mission | 64 |
| 141203009 | 11/24/2014 | 9 | 356.9 | Mission | 64 |
| 141203014 | 11/24/2014 | 9 | 724.2 | Mission | 64 |
| 141202035 | 11/26/2014 | 9 | 723.4, 724.40 | Mission | 64 |
| 150112024 | 12/16/2014 | 9 | N/A | Mission | 64 |
| 150112006 | 12/17/2014 | 9 | N/A | Mission | 64 |
| 150112023 | 12/17/2014 | 9 | 724.2 | Mission | 64 |
| 150112037 | 12/17/2014 | 9 | N/A | Mission | 64 |
| 150112028 | 12/18/2014 | 9 | N/A | Mission | 64 |

| | | | | | |
|---|---|---|---|---|---|
| 150113056 | 12/18/2014 | 9 | N/A | Auspicious | 53 |
| 150113058 | 12/18/2014 | 9 | N/A | Auspicious | 53 |
| 150118032 | 12/22/2014 | 9 | N/A | Auspicious | 53 |
| 150118037 | 12/22/2014 | 9 | 724.2 | Auspicious | 53 |
| 150113040 | 12/23/2014 | 9 | N/A | Auspicious | 53 |
| 140118078 | 12/29/2014 | 9 | 724.2 | Auspicious | 53 |
| 150118035 | 12/29/2014 | 9 | 724.2 | Auspicious | 53 |
| 150118081 | 12/29/2014 | 9 | N/A | Auspicious | 53 |
| 150118085 | 12/29/2014 | 9 | N/A | Auspicious | 53 |
| 150118021 | 12/30/2014 | 9 | 789.00 | Auspicious | 53 |
| 150118026 | 12/30/2014 | 9 | N/A | Auspicious | 53 |
| 150118056 | 12/30/2014 | 9 | N/A | Auspicious | 53 |
| 150118065 | 12/30/2014 | 9 | 724.2 | Auspicious | 53 |
| 150118058 | 12/31/2014 | 9 | N/A | Auspicious | 53 |

163.    On information and belief, the Defendants, directly or indirectly, pay and/or have offered to pay all or part of the wages of staff performing urine collection services and laboratory technician services for clients and prospective clients.  On information and belief, the Defendants pay staff wages in exchange for the health care provider not billing for POCT testing so that Defendants can bill Medicare and others for the more expensive EIA screening tests.   On information and belief, the wages are also paid in exchange for all urine specimens being sent to Pinnacle and other Shah Laboratories for drug testing.

164.    In a conversation about Uday Shah's efforts to obtain the TLCOD business, Shah specifically told relator that he had offered to pay the salary of TLCOD's lab tech in exchange for its confirmation testing referrals.

165.    Uday Shah told Relator that he pays the salaries of some of the laboratory technicians at client offices in exchange for urine samples for confirmation testing—he did not identity the specific individuals.

166.    Likewise, on or about Oct 24th 2014, Angie Newman (owner of ABN Billing) told Relator that she pays, on behalf of Shah, the salaries of lab techs running in-house analyzers at client offices.

167.    On Tuesday, February 3, 2015, Kim Nicholson reported to Relator that she witnessed Mitali Shah draft a check from MLS Upper Management to an entity affiliated with Dr. ID 42 for $6,000.00.

168.    Following the MLS Upper Management payment, Pinnacle has billed Medicare and Medicaid for confirmation testing on specimens referred to Pinnacle by Dr. ID 42.

## D.    FALSE CERTIFICATIONS

169.    As directed by Uday Shah, Pinnacle routinely waives collection of deductibles and copayments due from Medicare and Medicaid beneficiaries.

170.    Pinnacle nonetheless certifies to Medicare and Medicaid that its actual charge for the billed testing services includes the amount represented by the deductible and copayments.

171.    By way of representative example, where Pinnacle claims that its charge for a screening (& validity) test is $187, but routinely waives the 20% copayment, the actual charge is $149.60.  Medicare and Medicaid should be paying 80 percent of $149.60 (or $119.68), rather than 80 percent of $187.00.  As result of Pinnacle's misrepresentation, Medicare and Medicaid are paying Pinnacle approximately $40 more than they should for each screening test.

172.    Likewise, where Pinnacle claims that its charge for a confirmatory test of a single analyte is $40, but routinely waives the 20% copayment, the actual charge is $32.  Medicare and Medicaid should be paying 80 percent of $32 (or $25.60), rather than 80 percent of $40 (or $32).  As result of Pinnacle's misrepresentation, Medicare and Medicaid are paying Pinnacle $8 more than they should for confirmatory testing of each analyte.  Accordingly, for the Pacific Custom

Panel, Medicare and Medicaid are paying Pinnacle $384 ($8 x 48 analytes) more than they should; for the Auspicious Custom Panel, Medicare and Medicaid are paying Pinnacle $424 ($8 x 53 analytes) more than they should; and, for the Mission Custom Panel, Medicare and Medicaid are paying Pinnacle $512 ($8 x 64 analytes) more than they should.

173.    Pinnacle falsely certifies that the tests it bills to Medicare and Medicaid were reasonable and necessary.

174.    Pinnacle falsely certified that it performed the confirmation tests it billed to Medicare and Medicaid.

175.    Pinnacle falsely certified that its bills to Medicare and Medicaid complied with applicable Medicare laws, specifically Medicare's conditions of payment.

### E.    CONSPIRACY

176.    Pinnacle, Mission, A&M Health, Uday Shah, Leena Shah, Mitali Shah, ABN Billing, Angie Newman, MLS Upper Management and Michelle Robichaux (collectively the "Defendants") conspired to commit a violation of 42 U.S.C. § 3729(a)(1)(A) and B.

177.    Mitali Shah is the sole manager of Pinnacle.  Matali knowingly permitted Pinnacle to participate in the conspiracy and to make false claims.  She also knowingly permitted, or acted with such reckless disregard and/or deliberate indifference to allow, her father, Uday Shah to control and use Pinnacle to defraud Medicare and Medicaid.

178.    Leena Shah is a managing member of Mission.  Leena knowingly permitted Mission to participate in the conspiracy.  She also knowingly permitted, or acted with such reckless disregard and/or deliberate indifference to allow, her husband, Uday Shah to control and use Pinnacle to defraud Medicare and Medicaid.

179.    Defendants had a single plan to get these false claims paid by Medicare, Medicaid and other federally funded programs.

180.    Defendants shared in the conspiratorial objective to get a these false claims paid.

181.    One or more of the conspirators performed an overt act in furtherance of the conspiracy to get the false claims paid.

182.    The following entities are owned and controlled, in whole or in part, by Uday Shah, Leena Shah and/or Mitali Shah:

    a.    Paramedical Solutions, LLC, a Texas limited liability company.

    b.    Prestige Laboratories, LLC, a Texas limited liability company.

    c.    Transcend Laboratories, LLC, a Texas limited liability company and client of Pinnacle.

    d.    Southside Diagnostics, LLC, a Texas limited liability company

    e.    International Chemical, Inc., a Texas corporation.

183.    On information and belief, Mission and possibly other Shah laboratories, such as those listed in the preceding paragraph, are routinely filing similar false claims for payment to Medicare, Medicaid and other federally funded programs, and/or are the Shahs cause those companies to act in concert with the other Defendants to carry out the false and fraudulent billing scheme described herein.

## COUNT I: FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)

184.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

185.    As a result of the Defendants' actions as set forth in this Complaint, Defendants knowingly presented or caused to be presented to the United States of America false or

fraudulent claims for payment or approval, in violation of 31 U.S.C.(a)(1)(A), including claims for urine drug testing provided, or allegedly provided, by Pinnacle to Medicare, Medicaid and other federally-funded program beneficiaries.

186.　As a result of Defendants' actions as set forth in this Complaint, the United States of America has been, and continues to be, severely damaged.

## COUNT II: FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

187.　Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

188.　As a result of the Defendants' actions as set forth in this Complaint, Defendants knowingly made, used, or caused to be made or used, false or fraudulent claims, records or statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims to actually be paid or approved, in violation of 31 U.S.C.(a)(1)(B)

189.　The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and is still paying or reimbursing Pinnacle as set forth in this Complaint.

190.　As a result of Defendants' actions as set forth in this Complaint, the United States of America has been, and continues to be, severely damaged.

## COUNT III: FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(C)

191.　Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

192.　As a result of the Defendants' actions as set forth in this Complaint, Defendants have conspired to commit violations of § 3729(a)(1)(A) and (B).

193.    As a result of Defendants' actions as set forth in this Complaint, the United States of America has been, and continues to be, severely damaged.

WHEREFORE, the Relator, individually, and on behalf of the United States, pray that judgment be entered as follows:

A.    Judgment against the Defendants, jointly and severally, for the amount of United States' damages, trebled as required by law, and such civil penalties as are required by law, together with costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

B.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d).

C.    Relator be awarded all costs and attorneys' fees incurred in the prosecution of this action.

D.    That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

E.    For any other relief, legal or equitable, that the Court deems appropriate.

Respectfully submitted,

William C. Hurt, Jr.
Aaron D. Reedy
HURT, DECKARD & MAY, PLLC
127 West Main Street
Lexington, KY 40507
bhurt@hdmfirm.com
areedy@hdmfirm.com
Telephone:  (859) 254-0000
Facsimile:  (859) 254-4763
*Counsel for Plaintiff*

**ATTENTION: DO NOT SERVE PURSUANT TO 31 U.S.C. §3730(b)(2)**